**LIST OF EXHIBITS:**

**Exhibit A:**    **2023-24 Faculty Appointment Contract.**

**Exhibit B:**    **Handbook excerpts – tenure & financial-exigency procedures.**

**Exhibit C:**    **July 2024 CBU public statement.**

**Exhibit D:**    **AAUP letter dated 30 July 2024.**

**Exhibit E:**    **EEOC Charge No. 490-2024-02322_ May 10 2024.**

**Exhibit F:**    **EEOC Charge No. 490-2024-02322 Amended with Discrimination_ October 25 2024.**

**Exhibit G:**    **EEOC Right-to-Sue letter March 21 2025.**

14

**Exhibit A:**

**2023-24 Faculty Appointment Contract.**



**Vice President for Academics**
650 East Parkway South
Memphis, Tennessee 38104
(901) 321-3231 • Fax (901) 321-3117
www.cbu.edu

FACULTY APPOINTMENT CONTRACT
(FULL-TIME)

CHRISTIAN BROTHERS UNIVERSITY (hereinafter called employer) appoints **Dr. Leigh M. Johnson**, (hereinafter called Faculty Member), **Associate Professor (Tenured)**, in the **Department of Religion and Philosophy** for the period from **August 17, 2023** to **May 11, 2024**.

The Faculty Member agrees with the employer to accept employment between both dates given, and it is further understood that the Faculty Member agrees to the following conditions of employment with CHRISTIAN BROTHERS UNIVERSITY:

1.     That the terms and conditions of the current university Faculty Handbook, as is currently in place and as may be modified or amended from time to time, must be observed and are hereby incorporated by reference and made a part of this contract. The Faculty Handbook is located on the CBU intranet.

2.     Faculty Member shall be paid **$54,933.00** for the Contract Term, and payments shall be as follows: The salary amount shall be divided into twenty-four (24) equal payments and paid semi-monthly, less taxes and withholding. The parties acknowledge that the Contract Term is for a period equal to an academic year, but, for the convenience of Faculty Member, the salary amount is paid over a twelve (12)-month period. Should either CBU or Faculty Member terminate the employment relationship on the last day of the academic year, the remaining balance of all salary owed (less normal withholding and taxes) shall be paid at the next regularly-scheduled pay period. Should the employment relationship terminate at a time other than at the end of an academic year, then Faculty Member will be paid on a *pro rata* basis for the time employed, but shall not be entitled to the full contract amount. All benefits cease at the date of termination, except for health benefits, which terminate on the last day of the month in which termination occurs.

3.     That the above stated salary is contingent upon the completion of service for the full term of this appointment and the teaching of a full-time teaching load. In the case of appointments for less than an academic year, or in the event of failure to teach a full-time teaching load or to complete the specified term of the appointment, salaries will be prorated.

4.     This contract shall be suspended and no services shall be required of the Faculty Member and the salary of the Faculty Member shall not accrue, become owing, or be due for the period or periods in which any of the following occur: 1) inability of the Faculty Member to perform services under this Agreement because of a prolonged illness, incapacity, or other reasons beyond the control of the Faculty Member, or 2) situations in which the operation of the University or the department in which the Faculty Member is employed is prevented, hampered, or interrupted because of *force majeure* events, including but not limited to: fire, flood, severe weather conditions, other acts of God, riot, war, governmental action, or any other cause beyond the control of the University. Further, a *force majeure* event would include CBU being unable to hold classes on campus or remotely during any part of the academic year due to a pandemic or epidemic.

5.     This appointment and the above stated salary are in consideration of the Faculty Member's satisfactory performance of duties and responsibilities assigned as a full-time Faculty Member of this institution, and such additional duties as may be assigned to Faculty Member from time to time, subject to the policies of the department or other area of assignment, and subject to the supervision and direction of appropriate representatives of this institution.

**CHRISTIAN BROTHERS UNIVERSITY**

6.    Involvement in activities outside the University, *e.g.*, outside business interests, teaching or consulting, during this academic year is permitted within the guidelines contained in the Faculty Handbook and with the understanding that such outside activities shall not hinder or diminish the Faculty Member's ability to carry out the responsibilities of a full-time Faculty Member.

7.    Attendance is required at the CBU Community Convocation, the Academic Convocation, and the Spring Commencement, and that attendance is expected at all meetings called by the President and the Vice President for Academics during the academic year.

8.    This contract is for the academic year covering the Fall and Spring semesters, unless otherwise noted. Teaching appointment for overload or for summer session shall be under separate contract.

9.    By acceptance of this appointment, Faculty Member agrees to abide by all of the terms and conditions of employment for Christian Brothers University as stated in the Faculty Handbook, the Employee Handbook and the Administrative Policies and Procedures Manual, including successful completion of any mandatory training related to the University's policies and procedures. Faculty Member also agrees to comply with the Drug-Free Workplace Act of 1988 as defined in published institution statements and policy. Faculty Member also agrees to notify the Department of Human Resources of any criminal drug conviction for a violation occurring in the workplace no later than five days after such conviction or within ten days for a criminal conviction for a drug statute violation.

10.    This contract represents the entire understanding between the Employer and Faculty Member and no verbal agreement, assumption, or other statement will in any manner affect the provisions of this contract unless appended to this contract as a supplemental agreement.

11.    **Other**:


*Paul Haught*
_____
Dr. Paul Haught
Vice President for Academics

**05/24/2023**
_____
Date


*Leigh Johnson (May 24, 2023 11:45 CDT)*
_____
Dr. Leigh M. Johnson

**05/24/2023**
_____
Date


Copy Distribution: Employee - Academic Affairs - Human Resources



**Vice President for Academics**
650 East Parkway South
Memphis, Tennessee 38104
(901) 321-3231 • Fax (901) 321-3117
www.cbu.edu

May 18, 2023

Hello.

Enclosed please find your contract for the 2023-2024 Academic Year. We ask that all faculty members receiving a contract with a June 1, 2023 start date return their signed copies by Friday, May 19, 2023. All other faculty, please return your signed contract by Friday, May 26, 2023.

If you have any questions please contact me at 321-3579 (phaught@cbu.edu) or Liz Deeley at 321-3231 (edeeley@cbu.edu).

Thank you for all you do. We very much appreciate your efforts on behalf of your students.

Sincerely,

Paul C. Haught

Paul Haught, Ph.D.
Vice President for Academics

PH/ld

# 2023-2024 FT Faculty Contract_Johnson_Leigh

Final Audit Report                                    2023-05-24

| | |
|---|---|
| Created: | 2023-05-18 |
| By: | Elizabeth Deeley (edeeley@cbu.edu) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAMtYkaiyryFu9S4bt2cbwcrkSDph1Lmvn |

## "2023-2024 FT Faculty Contract_Johnson_Leigh" History

Document created by Elizabeth Deeley (edeeley@cbu.edu)
2023-05-18 - 7:26:10 PM GMT- IP address: 216.30.25.50

Document emailed to Leigh Johnson (leigh.johnson@cbu.edu) for signature
2023-05-18 - 7:27:10 PM GMT

Email viewed by Leigh Johnson (leigh.johnson@cbu.edu)
2023-05-24 - 4:42:09 PM GMT- IP address: 104.47.56.254

Document e-signed by Leigh Johnson (leigh.johnson@cbu.edu)
Signature Date: 2023-05-24 - 4:45:07 PM GMT - Time Source: server- IP address: 68.91.31.22

Document emailed to Paul Haught (phaught@cbu.edu) for signature
2023-05-24 - 4:45:08 PM GMT

Email viewed by Paul Haught (phaught@cbu.edu)
2023-05-24 - 4:59:41 PM GMT- IP address: 104.47.57.254

Document e-signed by Paul Haught (phaught@cbu.edu)
Signature Date: 2023-05-24 - 4:59:51 PM GMT - Time Source: server- IP address: 216.30.25.50

Agreement completed.
2023-05-24 - 4:59:51 PM GMT

**Adobe Acrobat Sign**

**Exhibit B:**

**Handbook excerpts – tenure & financial-exigency procedures.**



# FACULTY HANDBOOK
## 2022-2023

CHRISTIAN BROTHERS UNIVERSITY

# Faculty Handbook
## (2022 – 2023)
## Contents

FOREWORD ......................................................................................................................................................3

**PART I. UNIVERSITY ORGANIZATION AND GOVERNANCE** ..................................................................4

1.1    HISTORY OF THE UNIVERSITY ...........................................................................................................4

1.2    MISSION AND INSTITUTIONAL GOALS .............................................................................................5

1.3    ORGANIZATIONAL CHARTS AND POSITION DESCRIPTIONS ........................................................6

1.4    BOARD OF TRUSTEES ...........................................................................................................................6

1.5    PRESIDENT ..............................................................................................................................................7

1.6    ACADEMIC OFFICERS ...........................................................................................................................7

1.7    OTHER OFFICERS OF THE ADMINISTRATION ...............................................................................10

1.8    STANDING COMMITTEES OF THE UNIVERSITY ............................................................................10

1.9    UNIVERSITY GOVERNANCE ..............................................................................................................16

**PART II. THE FACULTY** .............................................................................................................................17

2.1    DEFINITION OF FACULTY ..................................................................................................................17

2.2    DEFINITION OF ACADEMIC STATUS AND TITLES ........................................................................17

2.3    POLICIES ON RECRUITMENT AND APPOINTMENT .......................................................................20

2.4    ANNUAL REVIEW ................................................................................................................................24

2.5    POLICIES ON PROMOTION .................................................................................................................26

2.6    POLICIES ON TENURE .........................................................................................................................29

2.7    POLICIES AND PROCEDURES RELATING TO SEVERANCE ...........................................................32

2.8    FACULTY DUTIES AND RESPONSIBILITIES ...................................................................................35

2.9    FACULTY RIGHTS AND PRIVILEGES ...............................................................................................40

2.10   FACULTY LEAVE AND FRINGE BENEFITS ......................................................................................43

**PART III. INSTRUCTIONAL POLICIES** ....................................................................................................46

3.1    GENERAL RESPONSIBILITIES ...........................................................................................................46

3.2    CLASSROOM MANAGEMENT ............................................................................................................47

3.3    ACADEMIC MISCONDUCT (ALSO SEE SECTION 5, THE COMPASS) ...........................................48

3.4    GRADE APPEALS POLICY (ALSO SEE SECTION 5, THE COMPASS).............................................49

**APPENDICES: UNIVERSITY-WIDE POLICIES AND REGULATIONS** ....................................................52

APPENDIX A.1: POSITION DESCRIPTION FOR VICE PRESIDENT FOR ACADEMICS ............................53

APPENDIX A.2: POSITION DESCRIPTION FOR GENERAL EDUCATON DIRECTOR .............................54

APPENDIX A.3: POSITION DESCRIPTION FOR DEAN OF STUDENT SUCCESS ....................................55

APPENDIX A.4: POSITION DESCRIPTION FOR DEAN OF GLOBAL COLLEGE .....................................56

APPENDIX A.5: POSITION DESCRIPTION FOR DIRECTOR OF THE PLOUGH LIBRARY .....................58

APPENDIX A.6: POSITION DESCRIPTION FOR REGISTRAR ...................................................................59

APPENDIX A.7: POSITION DESCRIPTION FOR DIRECTOR OF A GRADUATE PROGRAM ...................60

APPENDIX A.8: POSITION DESCRIPTION FOR DIRECTOR OF STUDENT DISABILITY SERVICES .......61

1

APPENDIX A.9: POSITION DESCRIPTION FOR DIRECTOR OF INSTITUTIONAL RESEARCH AND
  EFFECTIVENESS ................................................................................................................ 62
APPENDIX A.10: POSITION DESCRIPTION FOR DIRECTOR OF THE HONORS PROGRAM .................................... 63
APPENDIX B: BYLAWS FOR THE FACULTY ASSEMBLY ....................................................................... 64
APPENDIX C: ACADEMIC COUNCIL ...................................................................................................... 69
APPENDIX D: GRADUATE COUNCIL ...................................................................................................... 70
APPENDIX E: BROTHERS RECRUITMENT POLICY ................................................................................. 71
APPENDIX F: DAY SUMMER PROGRAM POLICIES ................................................................................ 72
APPENDIX G: POLICIES ON PROGRAM CHANGES, REDUCTION, AND RETRENCHMENT ................................... 73
APPENDIX H: STATEMENT ON PERSONAL AND PROFESSIONAL QUALITIES OF FACULTY, STAFF
  AND ADMINISTRATION AT CHRISTIAN BROTHERS UNIVERSITY ............................................. 76
APPENDIX I: GUIDELINES FOR COMPENSATION OF FACULTY TEACHING TEMPORARY OVERLOADS .......... 78
APPENDIX J: PUBLIC AND PRIVATE GRANT APPLICATION POLICY .......................................................... 79
APPENDIX K: INTELLECTUAL PROPERTY ............................................................................................. 80
APPENDIX L: OVERSIGHT AND HIRING GUIDELINES FOR ADJUNCT FACULTY ..................................... 81
APPENDIX M: CHRISTIAN BROTHERS UNIVERSITY MEDIA POLICY ....................................................... 82
APPENDIX N: FUND RAISING POLICY ................................................................................................... 83
APPENDIX O: STATEMENT ON DISTRIBUTION OF TENURED AND UNTENURED
  FACULTY MEMBERS ............................................................................................................ 84
APPENDIX P: COPYRIGHT POLICY ....................................................................................................... 85
APPENDIX Q: POLICY ON CLASS SIZE .................................................................................................. 86
APPENDIX R: SELECTION PROCESS FOR THE DR. MARGUERITE COOPER DISTINGUISHED
  PROFESSOR AWARD............................................................................................................ 87
APPENDIX S: GUIDELINES FOR THE AWARDING AND FUNDING OF SABBATICALS............................. 88
APPENDIX T: DRUG FREE WORKPLACE POLICY .................................................................................. 90
APPENDIX U: FACULTY CREDENTIAL POLICY ..................................................................................... 91
APPENDIX V: ACCOMMODATION POLICY FOR STUDENTS WITH DISABILITIES .................................. 92
APPENDIX W: WEB POLICY................................................................................................................... 93
APPENDIX X: POLICIES ON ACADEMIC PROGRAM DEVELOPMENT AND CHANGE ............................. 96
APPENDIX Y: POLICY FOR RESPONDING TO ALLEGATIONS OF SCIENTIFIC MISCONDUCT FOR
  GRANTS AWARDED BY THE U. S. PUBLIC HEALTH SERVICE .............................................. 98
APPENDIX Z: PROFESSIONAL EDUCATION AND ACCREDITATION COUNCIL ...................................... 99
APPENDIX AA: SEXUAL HARASSMENT AND SEXUAL MISCONDUCT STANDARDS............................. 100
APPENDIX BB: REVISED EQUIVALENCIES FOR CREDIT HOURS AND CONTACT TIME ....................... 113
APPENDIX CC: POLICY ON FACULTY ASSIGNMENTS .......................................................................... 114
APPENDIX DD: SCHEDULE FOR (RE)APPOINTMENT: DEAN OF A SCHOOL....................................... 115
APPENDIX EE: SCHEDULE FOR (RE)APPOINTMENT: DEPARTMENT CHAIR ....................................... 116
APPENDIX FF: INTELLECTUAL PROPERTY POLICY FOR ONLINE COURSE LEASING ......................... 117
APPENDIX GG: ADMINISTRATIVE STRUCTURE.................................................................................... 118

As with the annual evaluation, the faculty member has a right to a written summary of that part of the proceedings of the Rank & Tenure Committee meeting that applies to the member. Such a summary should be requested from the VPA.

### 2.5.3.6   VPA

The VPA will review the recommendations of the Rank & Tenure Committee and will forward these recommendations to the President along with the VPA's own recommendations.

### 2.5.3.7   President

Upon reviewing the recommendations of the Rank & Tenure Committee and the VPA, the President will inform the faculty member of the decision by April 15 or as soon thereafter as reasonably practical. In the event the President does not follow the recommendations of the Rank & Tenure Committee, the President will inform both the faculty member and the committee in writing of the reasons for the decision.

### 2.5.4 Appeal Procedures – Advancement

If the faculty member is dissatisfied with the President's decision regarding the request for advancement, the faculty member may appeal the decision to the Faculty Review Committee upon the following grounds:

1.  Evidence of arbitrary and capricious* action;
2.  Pertinent evidence not available before;
3.  Evidence of defective procedure.

* A willful and unreasonable action without consideration or in disregard of facts or without determining principle. – Black's Law Dictionary

The Faculty Review Committee shall review the appeal based on the above grounds only and shall submit its decision by majority vote in writing to the Chair of the Board of Trustees prior to the May/June meeting of the year in which the request for advancement was made. The final decision rests with the Board of Trustees. See Section 1.8.4.2.

## 2.6 POLICIES ON TENURE

### 2.6.1 Meaning of Tenure

Christian Brothers University subscribes to the principle of academic tenure. The University considers tenure to be a privilege granted to a full-time faculty member after due consideration and not a right due all faculty members. The faculty member with tenure may expect to hold the teaching position until retirement or resignation, except in the case of evaluation which has demonstrated reason for dismissal (Section 2.7.4), planned reduction or re-direction in educational programs (see Section 2.7.3.1), or financial exigency (see Section 2.7.3.2). The University policy on the distribution of tenured faculty may be found in Appendix O.

Faculty members with tenure are evaluated by the Rank & Tenure Committee on a five-year basis (see Section 2.6.7), and such evaluation may lead to dismissal (see Section 2.7.4).

After retirement, appointment to the faculty is made on a term basis, mutually agreed upon by the individual faculty member and the VPA, with the approval of the President.

### 2.6.2 Definition of Probationary Status

The probationary period, which precedes the granting of tenure, gives the individual faculty member the time to demonstrate ability and gives colleagues the time to observe and evaluate performance. During this period, a faculty member has the same academic freedom as a tenured faculty member. Faculty members holding probationary appointments are evaluated for reappointment or non-reappointment on an annual basis.

### 2.6.3 Tenure Timeline

Beginning with a full-time faculty appointment, the probationary period shall normally not exceed seven years, including in these years any award of years of service mutually agreed upon in the first contract. However, Christian Brothers University will ordinarily require not less than four years of full-time ranked service at Christian Brothers University, even though that faculty member's total probationary period may be extended

beyond the normal maximum of seven (7) years. Approved leaves of absence are possible causes of such extension (Sections 2.9.2 and 2.10.8)

A faculty member on a visiting appointment who is subsequently given a tenure-track appointment may have some or all of the time spent in full-time visiting status count toward tenure, if this is agreed upon in writing by the faculty member and the VPA, with approval by the President, at the time a tenure track appointment is made. Any credit toward tenure for time spent in visiting status will also apply in determining eligibility for promotion and sabbatical leave.

### 2.6.4 Loci of Tenure

A faculty member is tenured in the University rather than a department, although the evaluation of performance is judged by service in a particular department or school of the University.

### 2.6.5 Criteria for Tenure

As Christian Brothers University is an institution of higher education dedicated to the common good, and as tenure is a means to certain ends, namely freedom of teaching, research, and professional activities, tenure is not granted solely on the basis of time served in teaching. To be granted academic tenure at Christian Brothers University, a faculty member must be (a) fulfilling well the criteria for the rank held; (b) showing promise of continuing to be a productive member of the academic community and the University; (c) exhibiting support for the values reflected in the University's mission; and (d) manifesting the expertise which the University deems pertinent to current and future educational programs and goals. Since effective teaching is an important aspect of a faculty members duties, at least the equivalent of one academic year of teaching (currently 24 semester credit hours) is required before tenure can be awarded."

Since effective teaching is an important aspect of a faculty members duties, at least the equivalent of one academic year of teaching (currently 24 semester credit hours) is required before tenure can be awarded.

The President, on the recommendation of the VPA and in consultation with the relevant academic department and Dean may grant tenure upon hiring to an administrator in an academic area, e.g., VP Academics, Dean of a School, etc., if the new hire has previously been awarded tenure from an institution for which evidence of effective teaching is a significant component for tenure. If the new hire has not previously been granted tenure or has tenure from an institution where effective teaching was not a significant requirement for tenure, then years toward tenure will be open to negotiation before a case is made to the Rank & Tenure Committee. (Revisions: Approved by F.A. 3-1-2018)

### 2.6.6 Procedures Relative to Advancement to Tenure

By October 1 of the sixth year of service, the tenure-track faculty member will submit a letter stating the desire to be reviewed for tenure to the VPA with appropriate copies to the Department Chair and Dean of the School.

By November 1 of the sixth year, the faculty member will submit to the Department Chair a self-evaluation statement which summarizes annual evaluations and performance in the criteria in Section 2.6.5.

By January 15, both the Department Chair and the appropriate Dean of the School shall have made separate judgments of the faculty member and shall have shared this evaluation with the faculty members of the department to seek their recommendations. Copies of the evaluation shall be provided to the faculty member. The faculty member shall then have at least 10 days to respond in writing. The response should be sent to the VPA with copies to the Department Chair and School Dean.

By February 1, all materials should be available for review by the Rank and Tenure Committee. During a spring semester meeting, the Rank & Tenure Committee will render an independent judgment on whether the faculty member has met the criteria, based upon the totality of the information it possesses.

The recommendation of the Rank & Tenure Committee will be forwarded to the VPA, who shall submit a recommendation and pertinent evidence to the President.

By March 15, or as soon as possible thereafter, the President shall inform the faculty member in writing regarding the application for advancement to tenure and the decision made. If tenure is granted, then tenure will begin with the contract for the academic year following the tenure decision. If tenure is not granted, the President will explain in writing to the applying faculty member. If the President does not follow the

recommendations of the Rank & Tenure Committee, the President will explain in writing the reasons to the Committee before the faculty member is notified of the decisions. If tenure is not granted, the contract issued to the faculty member for the academic year following the tenure decision will be a terminal contract. (revision of dates approved by F.A. 3-1-07)

**2.6.7 Appeals Procedures – Tenure**

A faculty member may appeal a decision of not granting tenure to the Faculty Review Committee upon the following grounds:

1. Evidence of arbitrary and capricious* action;
2. Pertinent evidence not available before;
3. Evidence of defective procedure.

*A willful and unreasonable action without consideration or in disregard of facts or without determining principle. – Black's Law Dictionary

The Faculty Review Committee shall review the appeal based on the above grounds only and shall submit its decision by majority vote to the Board of Trustees prior to the Trustees' meeting in the spring of the year in which the decision regarding the request for tenure was made. The final decision rests with the Board of Trustees.

**2.6.8 Procedures Governing 5 Year Tenure Review**

Each tenured faculty member has accepted the mutual obligations of tenure and acknowledges the professional duties consistent with tenure. Hence, a periodic peer review is advantageous to the faculty as a whole in monitoring for continued satisfactory performance.

Although a tenured faculty member continues to be evaluated by the member's Department Chair and Dean each year, these evaluations will be reviewed by the Rank & Tenure Committee at five-year intervals following the awarding of tenure. The Rank and Tenure Committee must be provided five complete annual evaluations of the tenured faculty member before a five-year tenure review can be undertaken. These five evaluations, if not consecutive, will comprise the faculty member's five most recent complete evaluations since the last post-tenure review. This review, which requires no additional documentation, will normally be held during the fifth year:

1. Since the granting of tenure, or
2. Since the last five year review, or
3. Since the last special 3-year probationary review.

The faculty member shall receive the assessment by the Department Chair and the Dean at least five days before the five-year review is presented to the Rank and Tenure Committee.

In the deliberation of the Rank & Tenure Committee, peer judgment shall be made on overall performance based on the same standards as were in effect at the time of the tenure decision.

If additional information arises during the Rank and Tenure review, the review process shall be postponed until the affected faculty member can be presented with the additional information and until he/she can adequately respond.

Judgment will be recorded only for "satisfactory" or "unsatisfactory" performance with a majority vote carrying. If judged "unsatisfactory", the faculty member and his/her immediate supervisor will be notified in writing by the Rank & Tenure Committee of specific recommendations to lead to a "satisfactory" judgment. A tenured faculty member assigned an "unsatisfactory" judgment can appeal to the Faculty Review Committee in accordance with Section 2.7.1.1.

A tenured faculty member who is assigned an "unsatisfactory" judgment will be placed on a special three-year probation beginning with the next contract. The faculty member will present a written case to the Committee in the third year of the probationary period.

If, after this three-year review, the decision of the Rank & Tenure Committee remains "unsatisfactory" by majority vote, the tenured faculty member will be granted a terminal two-year contract, after which official termination from the University will take effect. If the President does not accept the recommendation of the Committee, the President will inform the Committee in writing of the reasons.

### 2.6.9 Appeal Procedures - Dismissal

A faculty member may appeal a decision of dismissal to the Faculty Review Committee upon the following grounds:

1. Evidence of arbitrary and capricious* action;
2. Pertinent evidence not available before;
3. Evidence of defective procedure.

*A willful and unreasonable action without consideration or in disregard of facts or without determining principle. – Black's Law Dictionary

The Faculty Review Committee shall review the appeal based on the above grounds only and shall submit its decision by majority vote in writing to the Chair of the Board of Trustees at the May/June meeting of the year in which the decision regarding decision of dismissal was made. The final decision rests with the Board of Trustees.

## 2.7 POLICIES AND PROCEDURES RELATING TO SEVERANCE

At times, it may be necessary for the University or the individual faculty member to sever their professional relationship. In order to protect the interests of both parties, the various types of severance (non-reappointment, resignation, termination, dismissal) are here defined, and the policies and procedures related to each category are set forth. Retirement is covered in Section 2.9.3.

### 2.7.1 Non-reappointment

Since all initial, probationary appointments to the tenure-track faculty at Christian Brothers University are made with the understanding that both the University and the appointee will engage in a period of mutual evaluation prior to establishing a continuous association, a severance prerogative rests with both parties.

The term "non-reappointment" means that the University has decided not to renew a probationary appointment at the conclusion of its term. A major responsibility of Christian Brothers University is to recruit and retain the best-qualified faculty within its means; therefore, wide latitude, consistent with academic freedom and due process, is accorded to the University in meeting this responsibility.

The decision not to reappoint a probationary faculty member rests ultimately with the President. Recommendations for non-reappointment may originate from the Department Chair, Dean of the School, VPA or from the Rank & Tenure Committee.

The University will give written notice of appointment or non-reappointment:

1. On or before March 1, or at least three months prior to the expiration of an initial, one-year appointment if it expires during an academic year;
2. On or before December 15, or at least six months prior to the expiration of the second year appointment if it expires during an academic year; or
3. At least twelve months prior to the expiration of an appointment after two or more years of service at the University (see Section 2.8.5.1 for definition of academic year).

Since a notice of non-reappointment is not a dismissal for cause it is not necessary for the University to set forth its reasons in the initial notice on non-reappointment. Probationary faculty members are entitled to know the reasons for their non-reappointment, however, and at their request may have reasons given in writing. If faculty members wish to know the reasons for their non-reappointment, their requests should be made to and honored by the VPA.

Reasons for non-reappointment may include, but are not necessarily limited to, the following:

1. Unsatisfactory performance as judged by the Rank & Tenure Committee (see Section 2.4 on Annual Review);
2. Cancellation or redirection of a program*;
3. Declining enrollment or implementation of reduction policy*;
4. Financial exigency*;
5. Over-staffing*;
6. Prolonged mental or physical illness.

*For more information, see Appendix G on Policy on Program Changes, Reduction, and Retrenchment.

A faculty member may appeal a decision of non-reappointment as set forth in the next section.

### 2.7.1.1  Appeal Procedures - Non-reappointment

Any faculty member may appeal a decision for non-reappointment to the Faculty Review Committee upon the following grounds:

1. Evidence of arbitrary and capricious* action;
2. Pertinent evidence not previously available;
3. Evidence of defective procedure.

*A willful and unreasonable action without consideration or in disregard of facts or without determining principle. – Black's Law Dictionary

The Faculty Review Committee shall review the appeal based on the above grounds only and shall submit its decision by majority vote to the Board of Trustees prior to the Trustees' May/June meeting in which the decision regarding non-reappointment was made. The final decision rests with the Board of Trustees. See Section 1.8.4.2.

### 2.7.2 Resignation

Resignation is an action by which faculty members sever their relationship with the University.

Faculty members may resign at the end of an academic year provided that they give notice in writing at the earliest possible opportunity, but not later than March 1 or two weeks after receiving notification of the terms of their appointment for the coming year, whichever occurs later. Faculty members may request an extension of this time period in case of hardship, in a situation where they would otherwise be denied substantial professional advancement or personal opportunity, or in case of prolonged mental or physical illness. (A prolonged period is one that is expected to continue beyond an academic or a calendar year.) If a resignation is for reasons of prolonged mental or physical illness, the University, in consultation with the faculty member or the faculty member's representative, may consider whether a leave of absence would be appropriate and beneficial for all parties concerned.

### 2.7.3 Termination (tenured faculty)

Termination is a severance action by which the University terminates the services of a tenured faculty member without prejudice as to the faculty member's performance.

### 2.7.3.1  Changes in the Educational Program

A tenured faculty member may not be terminated as a consequence of normal operating policies unless there is no feasible way in which the qualifications of the person, or any which may be gained through retraining, can be fruitfully employed by the University. If a program, degree, or course of study is eliminated, it shall be incumbent upon the University to transfer the affected faculty member to an open position within the University, subject to satisfactory qualifications and/or a requirement of limited retraining. The University will assume a reasonable share of the cost of this retraining.

For more information, see Appendix G on Program Changes, Reduction, and Retrenchment.

A faculty member may appeal a decision of termination as set forth in Section 2.7.3.4.

### 2.7.3.2  Financial Exigency

In case of financial exigency, it may be necessary to eliminate Departments or programs which are not essential to the mission and goals of the University, have relatively few majors, and serve relatively few students from other Departments. If this is done, every effort must be made to relocate the affected faculty members as stated in 2.7.3.1.

If it becomes necessary to release contracted faculty, a Retrenchment Committee (see Appendix G) will determine the number to be terminated University-wide in order to relieve the state of exigency. This Committee shall then meet with the Academic Council to establish the number to be released in each School. Each Dean of the School will then meet with the Department Chairs to determine which faculty members are to be recommended for termination. Each level of determination is subject to the approval of the President. At all stages of this process, the present and future needs of each School and Department

must be considered. It is not intended that across-the-board terminations be made, but that each one involve rational judgments of what is possible, equitable, and the least damaging to the mission of the University.

Each Department Chair, acting with the advice and consent of the Dean of the School and the VPA, shall recommend which faculty members are to be retained, using the following criteria in order:

1. Tenure or status as a Christian Brother;
2. Merit, versatility, seniority;
3. The goals of the University regarding numbers of women, women religious, and members of minority groups.

For more information, see Appendix G on Program Changes, Reduction, and Retrenchment.

A faculty member may appeal a decision of termination as set forth in Section 2.7.3.4.

### 2.7.3.3   Prolonged Mental or Physical Illness

Termination for medical reasons will be based upon clear and substantiated medical evidence. Recommendations for such termination may originate from the Department Chair, Dean of the School, VPA, or from the Rank & Tenure Committee. Recommendations of the Rank & Tenure Committee will be forwarded to the VPA, who shall render a recommendation and pertinent evidence to the President. The President shall inform the faculty member in writing regarding the termination consideration and the decision made.

A faculty member may appeal a decision of termination as set forth in the next section.

Christian Brothers University complies with all applicable laws and regulations related to nondiscrimination in employment and educational opportunity.

### 2.7.3.4   Appeal Procedures

Any tenured faculty member whose position is to be terminated may appeal the decision to the Faculty Review Committee upon the following grounds:

1. Evidence of arbitrary and capricious* action;
2. Pertinent evidence not available before;
3. Evidence of defective procedure.

* A willful and unreasonable action without consideration or in disregard of facts or without determining principle. – Black's Law Dictionary

The Faculty Review Committee shall review the appeal based on the above grounds only and shall submit its decision by majority vote to the Board of Trustees prior to the Trustees' May/June meeting in which the decision of termination was made. The final decision rests with the Board of Trustees.

### 2.7.4 Dismissal

Dismissal is a severance action by which the University ends its professional relationship with a tenured faculty member for adequate cause. Dismissal is also the means by which the University removes from service, for adequate cause, probationary faculty members or faculty members on a term appointment before the end of their appointment.

A faculty member may be terminated for the causes listed below; but not limited to the following:

1. Unsatisfactory performance or lack of necessary expertise in teaching.
2. Dishonesty in teaching or research.
3. Willful failure to perform the duties and responsibilities for which the faculty member was employed, or refusal or continued failure to comply with the policies of Christian Brothers University, or to carry out specific assignments, when such policies or assignments are reasonable and non-discriminatory.
4. Conviction of a felony or a crime involving moral turpitude.
5. Improper use of narcotics or intoxicants which substantially impairs the faculty member's fulfillment of his or her department and institutional duties and responsibilities.
6. Willful disregard of accepted standards of professional conduct.
7. Falsification of employment on an employment application or other information concerning qualifications for a position.

**APPENDIX G: POLICIES ON PROGRAM CHANGES, REDUCTION, AND RETRENCHMENT**

Introduction:

It is the fervent hope of the Faculty, Administration, and Board of Trustees of Christian Brothers University that we are never beset by financial problems to the extent that implementing any of these Policies becomes necessary. However, as a compromise between idealism and pragmatism, it is desirable to prepare for the worst even while hoping for the best. Consequently, these Policies are arranged in three groups, with each group of policies designed to prevent the next from having to be implemented. Any implementation of the following policies is directed toward the goal of the sustained and productive life of the University as a Lasallian mission of the Brothers and their colleagues. In both the design and use of procedures, mutual trust and collaboration must be a high priority in order to preserve collegiality and not degenerate into an adversarial relationship of labor vs. management. Christian Brothers University will not base decisions with respect to these policies on race, color, sex, sexual orientation, age, mental or physical disability, national origin, genetic information, or any other protected status, and any categories protected by state and local law.

1.    **OPERATING POLICIES OF THE UNIVERSITY DURING NORMAL TIMES WHICH SHOULD PREVENT FINANCIAL DIFFICULTIES**

    a.    When new faculty members are appointed, they should be placed in tenure-track position ONLY if their position is believed to be a long-term one unless, in the judgment of the President, the number of faculty having tenure has become too large for the University to be flexible in meeting its educational mission. If they are hired, they should receive term contracts, with retroactive credit toward tenure if their positions become long term subsequently.

    b.    Attainment of tenure should always be a realistic possibility for anyone appointed to a tenure-track position. No tenure-track faculty member should be denied tenure because of a quota on the number of tenured faculty. (Refer to "Statement on Distribution of Tenured and Untenured Faculty Members" approved by the Board of Trustees Executive Committee on March 24, 1981).

    c.    In the event that the number of faculty having tenure has become too large for the University to be flexible in meeting its educational mission, the number may be reduced (over a period of years) through attrition, attractive accelerated retirement opportunities, and by limiting the number of new tenure-track appointments (refer to Paragraph a).

    d.    Academic administrators (Department Heads, Deans of the Schools, and VPA) should constantly evaluate programs as to their quality, student-teacher ratio, number of majors and students served, accreditations, marketing factors, ability to procure competent faculty, adherence to the mission and goals of the University, and other such factors. Long-term trends should be considered, not temporary or cyclic variations in enrollment. It may sometimes be necessary to eliminate a program or course of study in order to enhance the efficiency and quality of the University's operations. A proposal to eliminate a program or course of study might originate with a Department Head or Dean of School, the Planning Committee, the VPA, or the President. Such proposal should be submitted to the appropriate academic administrators, the Planning Committee, and the Faculty Assembly for their reactions and suggestions. A Final Decision is made by the President (for majors and programs) or the Board of Trustees (for degrees) upon the recommendation of the VPA.

    e.    If the University is not in a state of financial distress, it shall not be unreasonable to expand or even initiate some programs while others are being reduced.

    f.    A tenured faculty member may not be terminated as a consequence of normal operating policies (refer to the *Faculty Handbook* regarding termination policies and evaluation of tenured faculty), unless there is no feasible way in which the qualifications of the person, or any which may be gained through retraining, can be fruitfully employed by the University. If a program, degree, or course of study is eliminated, it shall be incumbent upon the University to transfer the affected faculty member(s) to an open position(s) within the University, subject to satisfactory qualifications and/or a requirement of limited retraining. The University will assume a reasonable share of the cost of this retraining.

g.      The Administration should always evaluate operations in the University with the intent of eliminating any which are considered unnecessary.

2.      **POLICIES TO BE IMPLEMENTED DURING TIMES OF FINANCIAL DIFFICULTY, SHORT OF EXIGENCY (Reduction Policy)**

a.      If it appears that the University is beginning to enter a period of financial difficulty, the President should make such a determination through consultations with the Planning Committee, the Academic Council, and the President's Cabinet. Criteria for acknowledging a condition of financial difficulty include the following:

1)      The projection of a budget deficit for a protracted period, either as a certain percentage or as a certain absolute amount,
2)      A decline or a projected decline in enrollment as a percentage or in absolute numbers,
3)      A decline of student-to-teacher ratios below an established minimum,
4)      Decreased teaching loads as either credit or contact hours.

The Board of Trustees shall consider the President's informed recommendations and make the final determination.

b.      The goal of this Reduction Policy shall be the sustained and productive life of the University as a Lasallian mission of the Brothers and their colleagues.
c.      During a time of financial difficulty, all areas of the University shall be reviewed for a just and fair proportion of any reduction which occurs.
d.      If a state of financial difficulty should be declared, there should be an intensification of the procedures outlined in Section I, Paragraphs a, c, d, and f.
e.      The viability and accreditation of each department (or program) must be considered before reductions in the number of faculty in that Department (or program) are enacted.
f.      The possibility of not filling faculty vacancies caused by attrition or retirement should be considered, while at the same time adhering to the principles stated in Paragraph e.
g.      Even in times of financial difficulty, it shall not be inconsistent to expand or initiate programs which would help the University recover from its problems.
h.      Any reductions in the faculty, staff, or administration must take into consideration the special status of the Christian Brothers as owners and operators of the University, and as teachers and workers who contribute a specific and special ministry to the university by virtue of their religious vocation. No Christian Brothers who is performing satisfactorily shall be terminated as a consequence of the implementation of the Reduction Policy.
i.      A tenured faculty member may not be terminated as a consequence of implementing this Reduction Policy unless there is no feasible way that the qualifications of the person, or any which may be gained through retraining, can be fruitfully employed by the University. If any positions held by tenured faculty members are eliminated, those persons will be relocated to an open position within the University, subject to satisfactory qualifications and/or a requirement of limited retraining. The position of any faculty member terminated as a consequence of implementing this Reduction Policy will not be filled within three years unless that faculty member is offered reinstatement.

3.      **POLICIES TO BE IMPLEMENTED IN TIMES OF FINANCIAL EXIGENCY (Retrenchment Policy)**

a.      Financial Exigency is the condition where the budget of the University can be balanced only by extraordinary means, the procedures outlined in Part 2, Section a. shall be employed to determine whether such a condition exists, except that the criteria should reflect even more serious deviations from the norm. There should be full realization of the consequences of such a declaration before it is made. As in Part II, the Board of Trustees shall make the final determination as to whether a state of financial exigency is declared.

b.      When a state of financial exigency has been declared, a Retrenchment Committee shall be established to advise the President on implementing these Policies. The Retrenchment Committee shall consist of the Planning Committee, two additional faculty members elected by the entire

74

faculty body, one member of the Board of Trustees, and the Senior Director of External Affairs & Donor Relations. The Committee shall recommend to the President a coordinated program of academic and non-Student Success which will allow the University to continue to fulfill its mission in as effective a way as possible. The Committee and other appropriate communication channels shall be used to inform the Christian Brothers University community of the ongoing financial status of the University.

c.     In case of Financial Exigency, it may be necessary to eliminate Departments or programs which are not essential to the mission and goals of the University, have relatively few majors, and serve relatively few students from other Departments. If this is done, every effort must be made to relocate the affected faculty members as stated in Section I, Paragraph f.

d.     If it becomes necessary to release contracted faculty, the Retrenchment Committee will determine the number to be terminated University-wide in order to relieve the state of exigency. The Committee shall then meet with the Academic Council to establish the number to be released in each School. Each Dean of the School will then meet with the Department Heads to determine which faculty members are to be recommended for termination. Each level of determination is subject to approval of the President. At all stages of this process, the present and future needs of each School and Department must be considered. It is not intended that across-the-board terminations be made, but that each one involve rational judgments of what is possible, equitable, and the least damaging to the mission of the University.

e.     Each Department Head, acting with the advice and consent of the Dean of the School and the VPA shall recommend which faculty members are to be retained, using the following criteria in order:

    1)     Tenure and Status as a Christian Brother
    2)     Merit, versatility, seniority
    3)     The goals of the University regarding numbers of women, women religious, and members of minority races.

f.     Similar retrenchment policies for Staff and Administration will be implemented concurrently and with regard to Section II, Paragraph g.

g.     The following considerations shall apply to faculty members who have been designed for termination due to Financial Exigency:

    1)     Notice of non-reappointment will be given, whenever possible, according to the timetable outlined in the *Faculty Handbook*.
    2)     If less than the usual notice is given, provision shall be made for severance salary commensurate with the length of past and potential service, insofar as possible.
    3)     Faculty members designated for release due to Financial Exigency may appeal, using appropriate procedures and faculty committees.
    4)     Faculty members designated for release due to Financial Exigency may offer to renegotiate their contracts for reduced salary rather than be released.
    5)     The position of any faculty member terminated as a result of Financial Exigency will not be filled within three years, unless that faculty member is offered reinstatement and a reasonable time in which to accept or decline.
    6)     In case of cessation of operation, the University's highest obligation in settling its affairs should be in assisting the faculty during their transition to employment elsewhere.

NOTE: Christian Brothers University declares that its policies are independent of those of any agency or organization and that it cannot be bound by interpretations of its policies by any outside agency.

**Exhibit C:**

**July 2024 CBU public statement.**

8/26/24, 11:04 AM     CBU continues recovery as new academic year nears | Memphis Local, Sports, Business & Food News | Daily Memphian

Case 2:25-cv-02618-MSN-atc    Document 2-2    Filed 06/17/25    Page 21 of 48
PageID 36

# Daily Memphian

**EDUCATION**

# CBU continues recovery as new academic year nears

By Bill Dries, Daily Memphian
Published: July 20, 2024 4:00 AM CT



**Christian Brothers University on Wednesday, Dec. 21, 2022.** (Mark Weber/The Daily Memphian file)

Christian Brothers University's new leaders say the Memphis institution has made progress toward its goal of being removed from probation with its accrediting agency and increasing enrollment.

"I'm not here to close the school. I'm here to help build it up," Interim CBU president Brother Chris Englert said on the WKNO-TV program "Behind The Headlines."

8/26/24, 11:04 AM    CBU continues recovery as new academic year begins | Memphis Local, Sports, Business & Food News | Daily Memphian

Case 2:25-cv-02618-MSN-atc    Document 2-2    Filed 06/17/25    Page 22 of 48
PageID 37

## Despite probation, CBU is hitting all targets and then some

"The school has no debt, which is a big plus. And we did end last year in the black, which is a real positive message," he said. "But one of the things I'm very optimistic about is when I go out in the community, everybody I've talked to wants to see CBU survive."

"Behind The Headlines," hosted by The Daily Memphian CEO Eric Barnes, airs on WKNO-TV Fridays at 7 p.m. and Sundays at 8:30 a.m. Watch the show now at the video link in this article or listen to the podcast version, which includes extended conversation.

Englert is seven weeks into his interim tenure. The CBU board of trustees selected him mainly because of his nearly 29 years as head of Christian Brothers High School.

Board chairwoman Emily Greer says Englert's name came up quickly and often because of his long tenure at CBHS and his connections in Memphis.

Englert was on sabbatical when CBU's board contacted him about the interim assignment.

Previous CBU President Dave Archer had already enacted $4 million in budget cuts in the fall of 2023 including cutting 28 faculty positions, several tenured and eliminating some courses.

Behind the Headlines Podcast                          FOLLOW    SHARE
**1503: CBU continues recovery as new academic ye**

0:00                                    31:56              1x

Subscribe on **Apple Podcasts**and **Spotify**.

The moves were a response to the probationary status imposed by the Southern Association of Colleges and Schools Commission on Colleges.

8/26/24, 11:04 AM          CBU continues recovery as new academic year begins | Memphis Local, Sports, Business & Food News | Daily Memphian

The board declared a "financial exigency" — a status that allows the trustees to make decisions without faculty approval.

The financial losses started in 2019 when enrollment dropped. But they had been building since 2015 when the college added new majors and hired professors, trying to grow over a chasm that, in hindsight, it couldn't leap, according to Archer.

## CBU president retires unexpectedly in midst of financial struggle

Greer said on the program that the COVID-19 pandemic didn't help either.

"It's a symptom of kind of what's going on in higher ed. People like to think it started with COVID, but if we're honest, it started before COVID — declining enrollment to some extent," she said. "Perhaps we needed to resize, restructure sooner. But certainly after COVID the numbers did not add up. The class sizes and the resources to those class sizes weren't aligned. And as a board, we said it's time to do that."

Greer said the course correction for the school does not reflect a problem with academics.

"The academics are still stellar," she said.

After the cuts in programming earlier this year, CBU has 1,746 students across 41 undergraduate majors and 11 graduate degree programs.

Englert is still meeting with faculty, students and supporters as part of getting established for the new academic year.

But he already has an idea about what realistic growth in students looks like.

"I don't think that it's realistic to consider doubling it," he said of enrollment. "I think sometimes we've had this pie-in-the-sky thing. My guess is that if we could have 300 freshmen, I think that would be a big corner that we have turned."

**TOPICS**

8/26/24, 11:04 AM                    CBU continues recovery as new academic year begins Memphis Local, Sports, Business & Food News | Daily Memphian

Case 2:25-cv-02618-MSN-atc    Document 2-2    Filed 06/17/25    Page 24 of 48
PageID 39

BEHIND THE HEADLINES    CHRISTIAN BROTHERS UNIVERSITY

BROTHER CHRIS ENGLERT    EMILY GREER

## Bill Dries on demand

Never miss an article. Sign up to receive Bill Dries' stories as they're published.

+ Follow



### Bill Dries

Bill Dries covers city and county government and politics. He is a native Memphian and has been a reporter for more than 40 years.

**Exhibit D:**

**AAUP letter dated 30 July 2024.**

# aaup

AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS

555 New Jersey Ave., NW, Suite 600, Washington, DC 20001
PHONE: 202.737.5900 ▪ www.aaup.org

July 30, 2024

VIA ELECTRONIC MAIL

Brother Chris Englert, FSC
Interim President
Christian Brothers University
650 East Parkway South
Memphis, Tennessee 38104

Dear President Englert:

Dr. Leigh M. Johnson, a tenured associate professor of philosophy with ten years of full-time service at Christian Brothers University has contacted the American Association of University Professors concerning the termination of her faculty appointment. We understand that, in a statement issued on September 28, 2023, then president David L. Archer and the board of trustees announced that they had determined that Christian Brothers University was in a condition of financial exigency, which would "result in campus-wide budget cuts" aimed at eliminating $4 million in compensation from the operating budget, including a $3-million reduction in faculty compensation. By semester's end, the administration had decided to close thirteen degree programs, including the philosophy concentration, and to terminate nine tenured faculty appointments, only some of which were located within the discontinued programs.

Professor Johnson reports that, in a December 7 in-person meeting and by letter of the same date, President Archer informed her of his decision to "eliminate [her] position," effective May 11, 2024, "as part of CBU's financial exigency process." At the same time, she was proffered a severance and release agreement, which she ultimately declined to sign, as its terms would have prevented her from seeking review or redress within the institution or the courts. We understand that Professor Johnson is the only one of the affected faculty members offered the agreement who did not accept it. No other philosophy faculty members' appointments were terminated; indeed, a former administrator whose position was eliminated in the financial exigency process was shifted to a full-time philosophy faculty appointment and assigned courses Professor Johnson had been scheduled to teach.

* * * * *

Our Association's interest in Professor Johnson's case stems from our longstanding commitment to the principles of academic freedom, tenure, and shared governance articulated in the enclosed 1940 *Statement of Principles on Academic Freedom and Tenure,* a document jointly formulated by the AAUP and the American Association of Colleges and Universities (formerly the Association of American Colleges) and endorsed by more than 280 scholarly societies and higher education organizations. As the 1940

President Englert
July 30, 2024
Page 2

*Statement* observes, "The common good depends upon the free search for truth and its free exposition." Under the 1940 *Statement*, tenure—understood as an indefinite appointment terminable only for cause "or under extraordinary circumstances because of financial exigency"—is the means of protecting academic freedom in teaching, scholarship, and intramural and extramural speech. The underlying premise is that faculty members whose appointments are insecure will lack the freedom to teach, conduct research, and participate in academic governance without fear of institutional sanction. We are pleased to note that several passages in the Christian Brothers University faculty handbook concerning academic freedom, tenure, and due process incorporate language from the 1940 *Statement*.

The AAUP's *Recommended Institutional Regulations on Academic Freedom and Tenure* (also enclosed) sets out standards that must be followed in conditions of financial exigency to appropriately involve the institution's faculty in decision-making and to protect academic freedom and tenure. Regrettably, these standards appear not to have been observed in Professor Johnson's case.

**Definition of Financial Exigency**

Regulation 4c(1) of the *Recommended Institutional Regulations* defines financial exigency as "a severe financial crisis that *fundamentally compromises the academic integrity of the institution as a whole* and that cannot be alleviated by less drastic means" than termination of faculty appointments (emphasis added). By contrast, the Christian Brothers University faculty handbook defines financial exigency as "the condition where the *budget of the University can be balanced* only by extraordinary means" (emphasis added). This far more permissive standard threatens academic freedom and the institution of tenure by setting a remarkably low threshold for the termination of faculty appointments, thus rendering precarious every faculty position at CBU. Your July 20 comments to the *Daily Memphian* that the university ended the 2023–24 academic year with "no debt" and "in the black" call into question whether Christian Brothers University last year was experiencing a bona fide financial exigency that necessitated the termination of tenured faculty appointments.[1]

**Faculty Involvement**

Regulation 4c(1) also requires that an elected faculty body should participate "in the decision that a condition of financial exigency exists or is imminent" and in determining whether "all feasible alternatives to termination of appointments have been pursued, including expenditure of one-time money or reserves as bridge funding, furloughs, pay cuts, deferred-compensation plans, early-retirement packages, deferral of nonessential capital expenditures, and cuts to noneducational programs and services, including

---

[1] Bill Dies, "CBU Continues Recovery As New Academic Year Nears," *Daily Memphian*, July 20, 2024, https://dailymemphian.com/article/45201/memphis-education-christian-brothers-university-continues-recovery-as-new-academic-year-nears.

President Englert
July 30, 2024
Page 3

expenses for administration." However, there is no indication that the CBU faculty or its
elected representatives were involved, before the administration and board declared
financial exigency and mandated that $3 million in savings would have to come from
reducing faculty compensation, in determining whether conditions of exigency were met
and whether other, less drastic means than terminations of tenured faculty appointments
were available.

Regulation 4c(1) further provides that the faculty or its elected representatives should
bear primary responsibility for "determining where within the overall academic program
termination of appointments may occur" and for "determining the criteria for identifying
the individuals whose appointments are to be terminated." However, under CBU's
regulations, those responsibilities appear to fall to the retrenchment committee—a body
principally comprising administrators and administratively appointed faculty members,
with only two elected faculty representatives. On October 12, President Archer charged
the retrenchment committee with recommending academic majors and programs for
elimination, using criteria he issued. He also charged the retrenchment committee with
determining "the number [of faculty appointments] to be terminated University-wide in
order to relieve the state of exigency." However, we understand from Professor Johnson
that decisions on these matters were made exclusively by President Archer, who
announced on October 31, prior to the retrenchment committee's first meeting, the
number of faculty appointments that would be terminated in each of the university's
schools. It appears, therefore, that the faculty and its elected representatives were not
accorded primary responsibility for making these decisions of grave import to the
academic mission of Christian Brothers University.

**Due Process**

Regulation 4c(3) describes the due-process protections that must be provided to affected
faculty members. They must be afforded, prior to termination, a full adjudicative, on-the-
record hearing before a faculty committee, similar in basic respects to what the AAUP
recommends for dismissal (see Regulation 5, "Dismissal Procedures" of the
*Recommended Institutional Regulations*). In that hearing, an affected faculty member
must be able to contest

- "the existence and extent of the condition of financial exigency," with the burden
  of proof resting with the administration;
- "the validity of the educational judgments and the criteria for identification for
  termination," with the important qualification that "the recommendations of a
  faculty body will be considered presumptively valid"; and
- "whether the criteria are being properly applied in the individual case."

Following such a hearing, according to Regulation 4(e), "the governing board will be
available for ultimate review" of the termination decision.

President Englert
July 30, 2024
Page 4

The CBU faculty handbook provides that faculty members whose appointments are
terminated under financial exigency procedures may appeal the decision to an elected
faculty review committee. They may submit evidence that a termination decision (1) was
arbitrary and capricious, (2) resulted from defective procedure, or (3) should be
reconsidered in light of "pertinent evidence not available before," after which they are
entitled to a hearing before the faculty review committee at which they may engage
another "faculty member as counsel, address the charges, confront adverse witnesses, and
present witnesses and evidence" on their behalf. The faculty hearing committee then will
come to a majority decision on the appeal and forward the case to the board of trustees
for a final decision.

On December 15, 2023, Professor Johnson filed an appeal with the faculty review
committee on all three of the grounds listed above. However, she reports that, following
several postponements, the committee did not hold a hearing in her case. As a result, the
administration terminated her appointment without affording her the opportunity to
contest the basis for that decision before elected peer representatives and the governing
board, depriving her of the basic elements of academic due process.

**Another Suitable Position**

Under Regulation 4c(5), prior to terminating an appointment for reasons of financial
exigency, the administration will, with faculty participation, "make every effort" to find
the affected faculty member "another suitable position within the institution," which in
Professor Johnson's case would be another tenured faculty appointment. This standard
reflects the fact that the AAUP regards tenure as held within an institution rather than
within a particular academic program, and it helps to ensure that terminations of faculty
appointments are based on bona fide financial exigency rather than impermissible
considerations. Consistent with this standard is the Christian Brothers University faculty
handbook requirement that in conditions of financial exigency "every effort must be
made to relocate the affected faculty members." Professor Johnson informs us that there
was no effort on the administration's part to retain her through such relocation.

**Severance Salary or Notice**

Finally, Regulation 4c(6) provides that long-serving full-time faculty members whose
appointments are terminated on the basis of financial exigency will be provided at least
one year's notice or severance salary. Similarly, the CBU faculty handbook provides that
such faculty will receive at least one year's notice or, failing that, be provided with
"severance salary commensurate with the length of past and potential service." Professor
Johnson did not receive a year's notice, nor was she provided with severance pay.

* * * * *

The information that we have received concerning this case comes to us primarily from
Professor Johnson, and we understand that you may have further information that would

President Englert
July 30, 2024
Page 5

contribute to our understanding of events. However, assuming the essential accuracy of
the facts recounted above, we strongly urge that Professor Johnson immediately be
reinstated to her tenured faculty appointment. We further urge that any actions taken in
the future to address CBU's financial situation comport with the policies described in this
letter and its enclosures.

We look forward to your timely reply.

Sincerely,

Mark Criley
Senior Program Officer
Department of Academic Freedom, Tenure, and Governance

Enclosures by email attachment

Cc:   Dr. Lydia Rosencrants, Provost and Vice President for Academics
      Dr. Tawny LeBouef Tullia, Dean, Rosa Deal School of Arts
      Dr. James Buchanan Wallace, Chair, Religion and Philosophy
      Professor Josie McQuail, President, Tennessee AAUP Conference
      Professor Leigh M. Johnson

**Exhibit E:**

**EEOC Charge No. 490-2024-02322_ May 10 2024.**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

| Tennessee Human Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone *(Incl. Area Code)* | Date of Birth |
|---|---|---|
| **Dr. Leigh Johnson** | **901-679-5937** | **08/19/1973** |

| Street Address | City, State and ZIP Code |
|---|---|
| **701 S. Barksdale St., Memphis, TN 38104** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| **Christian Brothers University** | **650** | **901-321-3552 (President)** |

| Street Address | City, State and ZIP Code |
|---|---|
| **650 East Parkway South, Memphis, TN 38104** | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN | Earliest **Sept 2023**   Latest **ongoing** |
| ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION | |
| ☐ OTHER *(Specify)* | ☒ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

Dr. Leigh Johnson (CP), a tenured Associate Professor in the Department of Religion and Philosophy at Christian Brothers University (R), files this Charge for workplace discrimination and wrongful termination due to sex (female). CP worked for R since 2014 when she was hired to fill a vacancy created by a former faculty member, Paul Haught (male) who moved into administration. CP taught between 185-260 students each academic year; teaching core curriculum courses like "Moral Values," "Theories of Human Nature," and "Medical Ethics," which are required for every student to graduate. CP has always been the only woman Philosopher in the Religion and Philosophy Department, and has always carried a heavier teaching load (i.e., taught more classes and more students per semester) than her male peers.

On September 28, 2023, President Archer (male) declared "financial exigency" for R, invoking the provisions of the Faculty Handbook whereby R could terminate tenured faculty positions if certain specific criteria were met, and if each individual termination was "rational." President Archer failed to follow the procedures, required by that same Handbook, prior to declaring a state of "financial exigency," and failed to provide a full financial disclosure of the institution's financial situation that might justify his declaration. Under conditions of financial exigency, the CBU Faculty Handbook– the "terms and conditions [of which] are incorporated and made a part of" every Faculty member's individual contract– set the criteria for termination of faculty with tenure as follows, in rank order: "(a) Tenure or status as a Christian Brother, (b) Merit, versatility, and seniority, (c) The goals of the University regarding numbers of women, women religious, and members of minority groups." In an email dated November 3, 2023, President Archer unilaterally declared subsection (c) (minority and women) would not be considered in decision-making.

In a meeting with President Archer and Dean Tullia (female) on December 7, 2023 (and in writing), CP was told her position was

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 5/9/24 _____ X _~signature~_ <br> *Date*       *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974.  See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

being "eliminated" by the President effective May 11, 2024.  CP was informed that her department Chair James Wallace (male) and Dean Tullia recommended and/or did not stop the wrongful recommendation, with President Archer making the final illegal position elimination decision. President Archer told CP her position was chosen for elimination because R is "eliminating the Philosophy degree" and because CP had the "least seniority in Philosophy" CP does not have the lowest seniority in the Department of Religion and Philosophy, and was the only one of three tenured Philosophers terminated. When challenged by CP about the rationale for terminating CP, given her demonstrated profitability for the University, President Archer acknowledged that he selected some faculty (i.e. CP) for termination irrespective of financial considerations. Choosing CP for non-financial reasons, during a state of "financial exigency," is evidence of pretext. CP was chosen due to her sex (female).

CP is the most productive member of her department (10-14 courses per year, versus her colleagues' 8 courses per year) and CP is not the most junior member of her department. Father Bruce Cinquegrani (male), Visiting Assistant Professor, was not terminated and is the most junior member of CP's department. Moreover, the CBU Handbook dictates that seniority, the least relevant to relieving financial exigency, is also the least important factor that R is permitted to consider when making termination decisions. CP's termination is pretextual as CP is more productive (compared to other similarly situated male members of her department), more "meritorious" (as evidenced by her annual reviews), more "versatile" (as evidenced by the range of "service" courses she taught for the University), and CP does not have the least seniority. CP was chosen for termination due to her sex (female).

On December 7, 2023, CP was given a severance package with a 45-day review period and told to speak with an attorney. An initial agreement was attempted, however, there is currently no signed severance package in place between the parties.

In November 2023, before she was aware of her termination, CP was coincidentally informed that, effective January 2024, R was re-assigning Vice-President Paul Haught (male) back to the Religion and Philosophy department as a teaching Professor, and some of CP's courses were being taken away from CP and re-assigned to Haught. R had eliminated Haught's position in October 2023 to cut expenses, but there was no open position in the Religion and Philosophy Department. However, after eliminating Haught's administrative position, he was returned to a department with no available positions. Haught had not taught courses since 2008.  R terminated CP and gave CP's classes to Haught, after terminating CP because of CP's sex (female). CP's termination is pretextual as R effectively "created" a faculty position for Haught in the department and gave him CP's classes, despite that CP is far more qualified to teach those courses and has been doing so with excellent reviews for the past decade. CP was replaced by Haught due to sex (female). According to the CBU Handbook, and by incorporation, CP's contract: "[t]he position of any faculty member terminated as a result of financial exigency will not be filled within three years, unless that faculty member is offered reinstatement and a reasonable time within which to accept or decline." CP's position was effectively reassigned to Haught and CP was not offered reinstatement as required. R is wrongfully discriminating (because of sex (female)) against CP through its acts and/or omissions in not reinstating CP, and in replacing CP with a far less qualified male.

On December 15, CP filed an appeal of her termination according to the protocols outlined in the Faculty Handbook and on December 18, 2023, submitted her written materials to the adjudicating body, the Faculty Review Committee (FRC). CP's appeal complained of unequal treatment, objected to her termination, requested a hearing, and provided evidence objecting to her termination on all three causes that the Faculty Review Committee is charged to consider: (a) evidence of arbitrary and capricious action, (b) pertinent evidence not available before, and (c) evidence of defective procedure. Under the Handbook, CP has the right to an appeal and hearing before the FRC (all male members – although there was supposed to be a female member, CP was informed that the female member recused herself). Despite numerous requests by CP, the FRC (at the direction and/or knowledge of R) refused to give CP a hearing. CP continued pursuing her appeal with the FRC up until the day before the deadline for her agreement/refusal of R's severance agreement, without any action or hearing from the FRC. This refusal of due process is

| I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **x** 6/9/24      **x** *[signature]*  _____ Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

discriminatory (because of CP's sex (female)).

On Friday, April 19, 2024, R announced the retirement of President Archer. On April 21, 2024, CP stated on social media: "Starting my final week in the classroom tomorrow. It's been a good 20yr run and I think I made a positive impact on at least a few hundred students' lives. Plan on going out with a bang." At the end was a firecracker emoji, a common emoji used to indicate a celebratory end to something. On April 26, five (5) days later, on her last teaching day, just moments before her last class, Dean Tullia came to CP's classroom and insisted (in front of CP's students) that CP walk to her (the Dean's) office where VP Ron Brandon (male) was waiting with an armed Memphis Police Officer (male) (not a campus Police officer). VP Brandon asked CP about the FB post and suggested it was a "threat." CP explained the celebratory nature of the turn of phrase and emoji. VP Brandon said he "needed help wrapping his head around the meaning of the post." VP Brandon refused to accept CP's response and said he needed "more explanation." CP tried again to reiterate that she had already explained the phrase and emoji and had students waiting. VP Brandon insisted she "needed" to take a seat, and "they would have someone else cover her class." CP disagreed, said they could wait for her to teach, search her bag or car. To CP's knowledge, no one searched her bag or car. Despite the intimidation and harassment, CP told her students (who were shocked and outraged for her) and taught her last class. VP Brandon and an Officer were still waiting after class. CP was not a threat. R knew it. R's actions were part of the ongoing harassment and intimidation due to CP's sex (female).

R is and has been wrongfully discriminating against CP, and terminated CP's position (effective May 11, 2024) due to her sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| X 5/9/24    X *[signature]*<br>   Date        Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

**Exhibit F:**

**EEOC Charge No. 490-2024-02322 Amended with Discrimination_ October 25 2024.**

EEOC Form 5 (11/09)

| AMENDED CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|

AMENDED CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

Charge Presented To:
[ ] FEPA
[X] EEOC                     Agency(ies) Charge No(s):

490-2024-02322

Tennessee Human Rights Commission                                      and EEOC

_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Dr. Leigh Johnson | 901-679-5937 | 08/19/1973 |

Street Address                                  City, State and ZIP Code

701 S. Barksdale St., Memphis, TN 38104

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Christian Brothers University | 650 | 901-321-3552 (President) |

Street Address                                  City, State and ZIP Code

650 East Parkway South, Memphis, TN 38104

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

Street Address                                  City, State and ZIP Code

DISCRIMINATION BASED ON (Check appropriate box(es).)

[ ] RACE   [ ] COLOR   [X] SEX   [ ] RELIGION   [ ] NATIONAL ORIGIN
X [ ] RETALIATION   [ ] AGE   [ ] DISABILITY   [ ] GENETIC INFORMATION
[ ] OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest          Latest
Sept 2023        ongoing

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Dr. Leigh Johnson (CP), a tenured Associate Professor in the Department of Religion and Philosophy at Christian Brothers University (R), files this Charge for workplace discrimination and wrongful termination due to sex (female). CP worked for R since 2014 when she was hired to fill a vacancy created by a former faculty member, Paul Haught (male) who moved into administration. CP taught between 185-260 students each academic year; teaching core curriculum courses like "Moral Values," "Theories of Human Nature," and "Medical Ethics," which are required for every student to graduate. CP has always been the only woman Philosopher in the Religion and Philosophy Department, and has always carried a heavier teaching load (i.e., taught more classes and more students per semester) than her male peers.

On September 28, 2023, President Archer (male) declared "financial exigency" for R, invoking the provisions of the Faculty Handbook whereby R could terminate tenured faculty positions if certain specific criteria were met, and if each individual termination was "rational." President Archer failed to follow the procedures, required by that same Handbook, prior to declaring a state of "financial exigency," and failed to provide a full financial disclosure of the institution's financial situation that might justify his declaration. Under conditions of financial exigency, the CBU Faculty Handbook– the "terms and conditions [of which] are incorporated and made a part of" every Faculty member's individual contract– set the criteria for termination of faculty with tenure as follows, in rank order: "(a) Tenure or status as a Christian Brother, (b) Merit, versatility, and seniority, (c) The goals of the University regarding numbers of women, women religious, and members of minority groups." In an email dated November 3, 2023, President Archer unilaterally declared subsection (c) (minority and women) would not be considered in decision-making.

In a meeting with President Archer and Dean Tullia (female) on December 7, 2023 (and in writing), CP was told her position was

| | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

X 5/9/24    X _(signature)_
Date        Charging Party Signature

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

EEOC Form 5 (11/09)

| AMENDED CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | |

**Tennessee Human Rights Commission** and EEOC
*State or local Agency, if any*

being "eliminated" by the President effective May 11, 2024. CP was informed that her department Chair James Wallace (male) and Dean Tullia recommended and/or did not stop the wrongful recommendation, with President Archer making the final illegal position elimination decision. President Archer told CP her position was chosen for elimination because R is "eliminating the Philosophy degree" and because CP had the "least seniority in Philosophy" CP does not have the lowest seniority in the Department of Religion and Philosophy, and was the only one of three tenured Philosophers terminated. When challenged by CP about the rationale for terminating CP, given her demonstrated profitability for the University, President Archer acknowledged that he selected some faculty (i.e. CP) for termination irrespective of financial considerations. Choosing CP for non-financial reasons, during a state of "financial exigency," is evidence of pretext. CP was chosen due to her sex (female).

CP is the most productive member of her department (10-14 courses per year, versus her colleagues' 8 courses per year) and CP is not the most junior member of her department. Father Bruce Cinquegrani (male), Visiting Assistant Professor, was not terminated and is the most junior member of CP's department. Moreover, the CBU Handbook dictates that seniority, the least relevant to relieving financial exigency, is also the least important factor that R is permitted to consider when making termination decisions. CP's termination is pretextual as CP is more productive (compared to other similarly situated male members of her department), more "meritorious" (as evidenced by her annual reviews), more "versatile" (as evidenced by the range of "service" courses she taught for the University), and CP does not have the least seniority. CP was chosen for termination due to her sex (female).

On December 7, 2023, CP was given a severance package with a 45-day review period and told to speak with an attorney. An initial agreement was attempted, however, there is currently no signed severance package in place between the parties.

In November 2023, before she was aware of her termination, CP was coincidentally informed that, effective January 2024, R was re-assigning Vice-President Paul Haught (male) back to the Religion and Philosophy department as a teaching Professor, and some of CP's courses were being taken away from CP and re-assigned to Haught. R had eliminated Haught's position in October 2023 to cut expenses, but there was no open position in the Religion and Philosophy Department. However, after eliminating Haught's administrative position, he was returned to a department with no available positions. Haught had not taught courses since 2008. R terminated CP and gave CP's classes to Haught, after terminating CP because of CP's sex (female). CP's termination is pretextual as R effectively "created" a faculty position for Haught in the department and gave him CP's classes, despite that CP is far more qualified to teach those courses and has been doing so with excellent reviews for the past decade. CP was replaced by Haught due to sex (female). According to the CBU Handbook, and by incorporation, CP's contract: "[t]he position of any faculty member terminated as a result of financial exigency will not be filled within three years, unless that faculty member is offered reinstatement and a reasonable time within which to accept or decline." CP's position was effectively reassigned to Haught and CP was not offered reinstatement as required. R is wrongfully discriminating (because of sex (female)) against CP through its acts and/or omissions in not reinstating CP, and in replacing CP with a far less qualified male.

On December 15, CP filed an appeal of her termination according to the protocols outlined in the Faculty Handbook and on December 18, 2023, submitted her written materials to the adjudicating body, the Faculty Review Committee (FRC). CP's appeal complained of unequal treatment, objected to her termination, requested a hearing, and provided evidence objecting to her termination on all three causes that the Faculty Review Committee is charged to consider: (a) evidence of arbitrary and capricious action, (b) pertinent evidence not available before, and (c) evidence of defective procedure. Under the Handbook, CP has the right to an appeal and hearing before the FRC (all male members – although there was supposed to be a female member, CP was informed that the female member recused herself). Despite numerous requests by CP, the FRC (at the direction and/or knowledge of R) refused to give CP a hearing. CP continued pursuing her appeal with the FRC up until the day before the deadline for her agreement/refusal of R's severance agreement, without any action or hearing from the FRC. This refusal of due process is

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 6/9/24      X [signature] Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| AMENDED CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | |

| Tennessee Human Rights Commission | and EEOC |
|---|---|
| State or local Agency, if any | |

discriminatory (because of CP's sex (female)).

On Friday, April 19, 2024, R announced the retirement of President Archer. On April 21, 2024, CP stated on social media: "Starting my final week in the classroom tomorrow. It's been a good 20yr run and I think I made a positive impact on at least a few hundred students' lives. Plan on going out with a bang." At the end was a firecracker emoji, a common emoji used to indicate a celebratory end to something. On April 26, five (5) days later, on her last teaching day, just moments before her last class, Dean Tullia came to CP's classroom and insisted (in front of CP's students) that CP walk to her (the Dean's) office where VP Ron Brandon (male) was waiting with an armed Memphis Police Officer (male) (not a campus Police officer). VP Brandon asked CP about the FB post and suggested it was a "threat." CP explained the celebratory nature of the turn of phrase and emoji. VP Brandon said he "needed help wrapping his head around the meaning of the post." VP Brandon refused to accept CP's response and said he needed "more explanation." CP tried again to reiterate that she had already explained the phrase and emoji and had students waiting. VP Brandon insisted she "needed" to take a seat, and "they would have someone else cover her class." CP disagreed, said they could wait for her to teach, search her bag or car. To CP's knowledge, no one searched her bag or car. Despite the intimidation and harassment, CP told her students (who were shocked and outraged for her) and taught her last class. VP Brandon and an Officer were still waiting after class. CP was not a threat. R knew it. R's actions were part of the ongoing harassment and intimidation due to CP's sex (female).

R is and has been wrongfully discriminating against CP, and terminated CP's position (effective May 11, 2024) due to her sex (female) in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 5/9/24    X _(signature)_ Date            Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

EEOC Form 5 (11/09)

| **AMENDED** CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | 490-2024-02322 |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

CP amends her Charge to include Retaliation and Retaliatory Harassment, as follows:

Respondent engaged in retaliatory conduct actions and/or omissions when it denied CP appropriate and required severance pay; when it denied her a due process hearing as required by the faculty handbook (which handbook is incorporated into CP's employment agreement); and when it harassed, defamed and harmed CP (retaliatory harassment) in retaliation for her complaints of discriminatory treatment and/or for pursuing this EEOC complaint against Respondent.

1.  **Denial of severance pay:**

    On December 7, 2023, R provided CP and each of the terminated faculty a separation agreement with a 45-day review period to sign or reject it. On December 15, 2023, CP requested a hearing in front of the Faculty Review Committee (FRC), complaining of unequal treatment. According to R's Faculty Handbook (Appendix G.3g.2) faculty terminated without the requisite 12-month notice are to receive "severance salary commensurate with the length of past and potential service." There is no release of claims, or forfeiture of due process rights, or any other limitations for receipt.

2.  **Denial of Loan Forgiveness:**

    Had R not wrongfully and illegally terminated CP, she would have earned full forgiveness of her student loans by August 2024. Initially, CP was resistant to signing given that the offered Termination and Separation Agreement meant that her contract with R would end prior to August 2024 and she wanted her hearing and the opportunity to present evidence to the FRC. R did offer CP a revised agreement whereby her contract would be extended to August, 2024 but with no additional monies, and only if she was willing not to have the requisite due process hearing. Ultimately, CP's employment ended in May 2024, short of her student loan forgiveness date.

3.  **Denial of due process:**

    On December 15, 2023, when CP requested a hearing in front of the FRC, which included her complaining of unequal treatment, CP outlined why she should prevail on all three grounds for an appeal. The FRC Chairperson, Dr. Scott Geis, male, first so significantly delayed giving CP a hearing, for approximately 40 days, until her deadline to sign or reject CBU's "Transition and Separation Agreement" was at its critical end. Despite multiple attempts to contact the FRC, R no hearing was set. CP was denied her due process. Subsequently, a former member of the FRC committee (Dr. Ben Jordan, male, who was also terminated from CBU), informed CP that the her hearing was intentionally delayed and sabotaged by members of R's administration.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Date 10/25/2024                         Charging Party Signature | SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE (month, day, year) |

EEOC Form 5 (11/09)

| **AMENDED** CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | 490-2024-02322 |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

4. **Denial of faculty participation:**

For the entirety of the Spring 2024 semester, CP was not included in any department meetings, copied on any departmental emails, or informed of any departmental decisions, despite (at that time) still holding the rank of tenured Associate Professor of Philosophy. Moreover, the Faculty Assembly President (Max Maloney, male) informed CP that she would not be recognized in any Faculty Assembly meetings for the remainder of her time at R, despite that her last date of employment was in May 2024.

5. **Harassment by Scott Geis:**

Dr. Scott Geis, Chairperson of the FRC, taught a course immediately before CP's in the same classroom in the Spring 2024 semester. While at the same time on the FRC which was refusing to respond or reply to CP regarding her pending Appeal (especially during the first 2 months of 2024), Dr. Geis intentionally refused to vacate their shared classroom three times a week (Mondays, Wednesdays, and Fridays). He would stay beyond his class and interfere with CP attempting to prepare for and start her class. Dr. Geis also frequently initiated inappropriate conversations with CP *in front of students*. For example, Dr. Geis would announce to the classroom when CP arrived that he "loved CP" and at least on one occasion he stated that he "recently had a dream about CP" or "wanted to feel closer to CP." By approximately the third week of February 2024, CP waited in the hallway outside the classroom for Dr. Geis to leave and informed him that his behavior made CP uncomfortable and asked Dr. Geis to leave the classroom on time and please not to interact with CP. Dr. Geis as part of the FRC knew of CP's complaint(s) of unequal treatment. CP has not seen Dr. Geis tell male faculty that the loves them, or dreams about them or that he wants to feel closer to them.

6. **Personal Harassment (Ron Brandon and Tawny Tullia):**

On April 28, 2024, the last day of the semester, Dean Tawny Tullia (female) and "acting" President Ron Brandon (male) pulled CP out of her classroom at the beginning of class and brought her to a room where she was interrogated in the presence of armed Memphis Police Department officers. They subsequently tried to prevent CP from returning to teach her last class. More details are described in CP's original charge. The Dean and acting President knew this was CP's last day of class and intentionally interfered with her classes in front of students, treating CP in a demeaning and mean manner, falsely alleging that her pre-final class social media post firecracker emoji meant that she was a treat to R. Both the Dean and acting President reasonably knew of CP's complaint(s) of unequal treatment.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *Date* 10/25/2024    *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 5 (11/09)

| **AMENDED** CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | 490-2024-02322 |

| Tennessee Human Rights Commission | and EEOC |
|---|---|
| *State or local Agency, if any* | |

7. **Harassment by Campus Security:**

On May 11, 2024, CP's last day of employment, she went to campus to retrieve the remainder of her belongings. Despite presenting her University ID, and despite having a key to both her building and office, she was initially prevented by campus security from accessing her office. The campus police officer stated he was acting upon instructions "from upper administration" to deny her access. CP was able (after 2 hours) to retrieve her belongings, after contacting R's chief of security, who is a friend of CP's.

8. **Delayed Salary Payments:**

R delayed paying CP the remainder of her salary (due May 15) until June 1. When CP initially called R's Human Resources department on May 15 to inquire, HR claimed CP had already received her "last paycheck" and that she should not expect any more disbursements from R in the future. This would mean that CP was denied her last wages. CP through counsel sought her monies and subsequently, CP was paid her remaining salary on June 1, two weeks after when she was to have received the monies.

9. **Online libel and Harassment:**

On May 30, 2024, the most widely-read online news site in professional Philosophy, *The Daily Nous*, published a story about Christian Brothers University's treatment of its tenured faculty and in that story included a link to a GoFundMe site that colleagues of CP had set up to help CP with legal expenses.

Between May 30 and June 5, 2024, there were *dozens* of defamatory, derogatory and harassing messages sent to both sites wrongfully claiming CP was "the worst professor CBU ever had," that she "bullied [her] colleagues," that there were "files stuffed with student complaints against [her]," and that "CBU is lucky to be rid of [her]." A number of these posts also referred to CP as "that lesbian," and "that bitch."

The Editor of *The Daily Nous* was able to confirm that **all** of the messages posted to this site came from IP addresses located on the CBU campus. Based on these comments of bullying "colleagues" and the content of "files", it is reasonably likely that these harassing messages were not from students but from employees of R.

10. **Interference with Tennessee unemployment benefits**

The last week of May 2024, CP filed for unemployment benefits with the Tennessee Department of Labor and Workforce Development. Her claim was immediately approved. However, two weeks later, she received a letter stating that she was "ineligible" for unemployment benefits because she was "on break" and had a "reasonable expectation of returning to work after break." The only way that misinformation could have happened is due to

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| *[signature]* | |
| Date _____ *Charging Party Signature* 10/25/2024 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

EEOC Form 5 (11/09)

| **AMENDED** CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC | **490-2024-02322** |

| **Tennessee Human Rights Commission** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

R making false statements to the Tennessee Department of Labor and Workforce Development in connection with CP's unemployment benefits.

It took CP approximately *2.5 months* to straighten this matter out, and she was only able to finally do so by directly having her state representative intervene on her behalf.

As described above, R has wrongfully retaliated against CP, and CP has been subjected to retaliatory harassment by R, due to CP having complained of discrimination and having filed an EEOC Charge, all in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Date 10/25/2024    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

55

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so <u>within 15 days</u> of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

**Exhibit G:**

**EEOC Right-to-Sue letter March 21 2025.**

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Little Rock Area Office
820 Louisiana St, Suite 200
Little Rock, AR 72201
(501) 900-6130
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 03/21/2025

To: Ms. Leigh M. Johnson PhD
701 Barksdale St.
Memphis, TN 38104

Re: EEOC Charge No: 490-2024-02322

EEOC Representative and email:    Joslyn Burchett
Investigator
joslyn.burchett@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 490-2024-02322.

On behalf of the Commission,

Digitally Signed By:William A Cash
03/21/2025

William A Cash
Area Office Director

**CC: Christian Brothers University**

Stephen Vescovo
40 S Main St STE 2900
Memphis, TN 38103

Theresa Jacques
Christian Brothers University
650 E Parkway S
Memphis, TN 38104

Christian Brothers University
650 East Parkway South
Memphis, TN 38104

Maureen T Holland Esq.
Holland & Associates, PC
1429 Madison Ave
Memphis, TN 38104


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01 22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 490-2024-02322 to the

Enclosure with EEOC Notice of Closure and Rights (01/22)

District Director at Delner Franklin-Thomas, 200 Jefferson Ave Suite 1400, Memphis, TN 38103.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 490-2024-02322 to the District Director at Delner Franklin-Thomas, 200 Jefferson Ave Suite 1400, Memphis, TN 38103.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.