**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TENNESSEE**

**WESTERN DIVISION**

DR. LEIGH M. JOHNSON,

      Plaintiff,

v.                            Case No. 2:25-cv-02618-MSN-atc

CHRISTIAN BROTHERS UNIVERSITY,

      Defendant.

---

**FIRST AMENDED COMPLAINT**

**(Jury Trial Demanded)**

---

**I. PRELIMINARY STATEMENT**

1.    Plaintiff Dr. Leigh M. Johnson brings this action to redress unlawful sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and to recover damages for Defendant Christian Brothers University's breach of her tenured-faculty employment contract.

2.    The three claims in this case are interlocking. CBU invoked "financial exigency" as the stated rationale for eliminating Dr. Johnson's tenured position, but that rationale was selectively applied, procedurally manipulated, and pretextual. The retrenchment process that led to Dr. Johnson's termination was conducted in a manner that violated Title VII's

prohibitions on sex discrimination, punished Dr. Johnson for engaging in protected activity, and breached the contractual obligations CBU undertook when it incorporated the Faculty Handbook into Dr. Johnson's annual employment contracts.

3.      The evidence of sex discrimination is anchored in a written directive from CBU President David Archer—the "Presidential Charge to Chairs and Deans," issued October 31, 2023—that simultaneously transmitted the school-by-school faculty cut numbers to Department Chairs and Deans and launched the individual personnel selection process. In that same document, Archer declared that Handbook criterion (3)—the only retention criterion that explicitly accounted for gender—was "not applicable," directing that recommendations "should be made irrespective of gender and race." The Chairs and Deans who then identified specific faculty members for termination never had a version of the retention criteria that included criterion (3). It was eliminated before the personnel selection process began.

4.      The Faculty Handbook sets out three criteria that must be applied "in order" when selecting which faculty to retain during retrenchment: (1) tenure and status as a Christian Brother; (2) merit, versatility, and seniority; and (3) the University's goals regarding numbers of women, women religious, and members of minority groups. This ordered structure reflects a deliberate institutional judgment: tenure is to be the first and strongest protection against termination, and the remaining criteria are to serve as a further check against outcomes that are arbitrary, inequitable, or contrary to the University's mission. The high threshold for terminating a tenured faculty member is not incidental—it is the point.

5.      Archer's stated rationale for eliminating criterion (3) was that CBU "does not have 'goals' with respect to" the representation of women and therefore "does not have such targets for

faculty or staff hiring." But criterion (3) does not require numerical targets. It requires that the University's goals regarding the representation of women be considered as a factor in retention decisions—a consideration that was most urgent at the precise moment Archer eliminated it. Emily Holmes, the only other tenured woman in the department, had resigned less than one week before the December 7 termination meetings. Terminating Dr. Johnson would leave the Department of Religion and Philosophy with an entirely male faculty. The directive to proceed "irrespective of gender" removed the one Handbook mechanism designed to prevent that outcome. Archer compounded this in his termination meeting with Dr. Johnson with respect to criterion (2)—which the Handbook states as "merit, versatility, seniority"—reducing a three-factor criterion to a single factor (seniority) and discarding the merit and versatility considerations that favored Dr. Johnson. The result was structurally predetermined: the only tenured female philosopher was terminated; the only tenured male philosopher was retained.

6.      The discriminatory outcome is further reflected in the following: CBU retained an untenured male faculty member while terminating a tenured female faculty member—an inversion of the Handbook's mandatory first retention criterion. CBU planned to fill Dr. Johnson's position with a reassigned male administrator, in apparent violation of the Handbook's prohibition on refilling a terminated faculty member's position within three years. And CBU scheduled a termination meeting for a male professor in the School of Arts whose program was also discontinued, then canceled that meeting at the last minute, leaving him employed while proceeding to terminate Dr. Johnson.

7.      The retaliation claim rests on a documented sequence. Dr. Johnson filed an internal appeal that identified the elimination of the gender-based retention criterion as inconsistent with

3

the Handbook's requirements and the University's stated mission with respect to gender-based discrimination; the chair of the Faculty Review Committee (the "FRC") communicated ex parte with administration officials, postponed or delayed Dr. Johnson's hearing to a date that fell after her severance-signing deadline, and told the committee it could not evaluate whether the exigency procedures were defective—eliminating one of the three express Handbook grounds for appeal. After Dr. Johnson revoked her severance agreement, CBU abandoned the appeal entirely, excluded her from departmental activities, interfered with her ability to speak in Faculty Assembly, removed her from a classroom in front of students in the presence of police, and interfered with her retrieval of personal property.

8.      The breach of contract claim alleges not merely that CBU terminated Dr. Johnson, but that it did so in violation of specific procedures it had contractually obligated itself to follow governing how a tenured professor could be selected for termination, notified, severed, and heard.

## II. JURISDICTION AND VENUE

9.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

10.     This Court has supplemental jurisdiction over the state-law breach of contract claim pursuant to 28 U.S.C. § 1367(a), because that claim arises from the same nucleus of operative facts as the Title VII claims.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-
       5(f)(3) because the employment practices alleged herein occurred within the Western
       District of Tennessee, in Shelby County.


## III. PARTIES

12.    Plaintiff Dr. Leigh M. Johnson is a female individual who, at all times relevant to this
       action, was employed as a tenured Associate Professor in the Department of Religion and
       Philosophy at Christian Brothers University in Memphis, Tennessee. Dr. Johnson's
       employment was terminated effective May 11, 2024. She currently resides in Washington,
       D.C.

13.    Defendant Christian Brothers University ("CBU") is a private university located at 650
       East Parkway South, Memphis, Tennessee 38104. CBU is an employer within the meaning
       of Title VII, 42 U.S.C. § 2000e(b), employing more than fifteen persons. CBU is a Roman
       Catholic institution in the tradition of the De La Salle Christian Brothers.


## IV. ADMINISTRATIVE PREREQUISITES

14.    On or about May 10, 2024, Dr. Johnson filed a Charge of Discrimination with the Equal
       Employment Opportunity Commission ("EEOC"), Charge No. 490-2024-02322, alleging
       sex discrimination in violation of Title VII. A copy of the Charge is attached as Exhibit E
       (ECF 2-2).

15.    On or about October 25, 2024, Dr. Johnson filed an Amended Charge of Discrimination
       with the EEOC adding a claim of retaliation in violation of Title VII. A copy of the
       Amended Charge is attached as Exhibit F (ECF 2-2).

16.    On March 21, 2025, the EEOC issued a Notice of Right to Sue. A copy of the Notice is attached as Exhibit G (ECF 2-2). This Complaint was filed within ninety days of receipt of that notice. All administrative prerequisites to suit have been satisfied.

## V. FACTUAL ALLEGATIONS

**A. Dr. Johnson's Qualifications, Teaching Record, and Productivity**

17.    Dr. Johnson holds a Ph.D. in Philosophy. Prior to her employment at CBU, she taught courses in philosophy, religion, history, and technology for seven years at Rhodes College in Memphis, Tennessee.

18.    CBU hired Dr. Johnson in August 2014 as a Visiting Assistant Professor in the Department of Religion and Philosophy. Her position was subsequently converted to a tenure-track appointment. Dr. Johnson earned tenure at CBU in February 2018. At the time of her termination, she held the rank of tenured Associate Professor.

19.    Dr. Johnson's 2023–2024 employment contract, executed between the parties, confirmed her status as a tenured Associate Professor in the Department of Religion and Philosophy at a base salary of $54,933. Her average annual compensation from 2018 through 2023, as reflected in her W-2 earnings, was approximately $62,818. A copy of the 2023–2024 Faculty Appointment Contract is attached as Exhibit A (ECF 2-2).

20.    The standard faculty teaching load at CBU is four courses per semester (a "4/4" load). Dr. Johnson taught five courses per semester (a "5/5" load) every year from 2014 through Fall 2023, without exception and without sabbatical, and also taught between two and four additional courses each summer.

21.    Dr. Johnson's courses were consistently fully enrolled or over-enrolled. Approximately ninety-five percent of her student credit hours served General Education Requirements ("GER") applicable to students across all majors and schools at CBU, not only to Religion and Philosophy majors. Her courses included multiple sections per semester of the required "Moral Values" GER course, required Medical Ethics courses covering the Nursing program and Master of Science in Physician Assistant Studies program, and "Technology and Human Values" for Computer Science and Engineering students.

22.    Dr. Johnson was identified by multiple CBU administrators and faculty leaders—including her Department Chair, her Dean, former Vice President of Academic Affairs Paul Haught, former CBU Presidents John Smarrelli and Jack Shannon, and tenured Professor Scott Geis—as among the most productive faculty members at CBU by student credit hour ("SCH") generation. Her student evaluation scores were above CBU, School of Arts, and departmental averages, and her annual evaluations from her Chairs and Deans were consistently positive throughout her employment.

23.    Dr. Johnson's academic training is broad and multidisciplinary. She is qualified to teach courses in Christian theology, the Catholic intellectual tradition, and a range of other religious studies topics, as well as the full philosophy curriculum.

**B. The Department of Religion and Philosophy at the Time of Retrenchment**

24.    At the time of the retrenchment decisions in late 2023, the Department of Religion and Philosophy was one of the departments within the School of Arts at CBU. The retrenchment decisions affecting the Department of Religion and Philosophy were made at the School of Arts level, by School of Arts Dean Tawny LeBouef Tullia and Department

Chair James Wallace, subject to President Archer's approval. The department consisted of the following faculty members:

(a)  Philip ("Max") Maloney, Professor, tenured, specializing in philosophy. Male. Retained.

(b)  Dr. Leigh M. Johnson, Associate Professor, tenured, specializing in philosophy. Female. Terminated.

(c)  Burt Fulmer, Professor, tenured, specializing in religion. Male. Terminated.

(d)  Scott Geis, Professor, tenured, specializing in religious studies. Male. Retained. Geis had previously served as Dean of the School of Arts and as Chair of the Department of Religion and Philosophy. He was subsequently appointed Chair of the Faculty Review Committee convened to hear Dr. Johnson's appeal.

(e)  Emily Holmes, Professor, tenured, specializing in religion. Female. Resigned less than one week before the December 7, 2023, termination meetings.

(f)  James Wallace, Professor, tenured, specializing in religion. Male. Retained. Department Chair.

(g)  Bruce Cinquegrani, Visiting Assistant Professor, not tenured, specializing in religion. Male. Retained. A Catholic priest, but not a member of the De La Salle Christian Brothers.

25.    Philip Maloney and Dr. Johnson share practically identical academic training in philosophy. Dr. Johnson is qualified to teach each course in the department's curriculum that Maloney teaches, but the reverse is not true. Maloney is male and was retained; Dr. Johnson is female and was terminated.

26.    Bruce Cinquegrani was the only member of the Department of Religion and Philosophy
who did not hold tenure at the time of the retrenchment decisions. Cinquegrani joined CBU
as a full-time faculty member in 2015. Dr. Johnson was hired at CBU in 2014 and therefore
had greater seniority than Cinquegrani. Cinquegrani's teaching responsibilities were
confined to religion courses. Upon information and belief, Cinquegrani remains employed
at CBU at least through the filing of this Amended Complaint.

## C. The Faculty Handbook and Retrenchment Procedures

27.    The Faculty Handbook is incorporated by reference into Dr. Johnson's annual employment
contracts. CBU's answer in this action admits that the Faculty Handbook governs the terms
and conditions of faculty employment at CBU. Relevant excerpts of the Faculty Handbook
are attached as Exhibit B (ECF 2-2).

28.    The Faculty Handbook's Appendix G sets out three separate frameworks corresponding to
different levels of institutional financial distress: Appendix G.1 (policies designed to
sustain normal operations and avoid exigency), Appendix G.2 (Financial Difficulty, Short
of Exigency), and Appendix G.3 (Financial Exigency / Retrenchment Policy). The
Handbook states that the three frameworks are "arranged with each group of policies
designed to prevent the next from having to be implemented."

29.    Appendix G.3.e provides that where tenured faculty must be terminated, the department
head—with the consent of the Dean and the Vice President for Academics—is required to
recommend which faculty to retain using the following criteria:

(1)    Tenure or status as a Christian Brother;

(2)    Merit, versatility, and seniority; and

(3)    The goals of the University regarding numbers of women, women religious, and members of minority groups.

30.    Appendix G.3.g.1 of the Handbook provides that notice of non-reappointment will be given, whenever possible, according to the timetable outlined in the Faculty Handbook. Appendix G.3.g.2 provides that if less than the usual notice is given, provision shall be made for severance salary commensurate with the length of past and potential service, insofar as possible. The Handbook identifies no other stipulations on terminated faculty receiving severance, including the waiver of their right to pursue grievances, complaints, or legal action.

31.    Appendix G.3.g.3 of the Handbook provides that a terminated faculty member has the right to appeal to the Faculty Review Committee (the "FRC")—the standing committee charged with hearing faculty grievances and appeals—which must hold a hearing at which the aggrieved party may bring faculty counsel, address the charges, confront adverse witnesses, and present evidence. The Faculty Review Committee's written recommendation is delivered to the Board of Trustees, which issues the final decision.

32.    Appendix G.3.g.5 of the Handbook provides that "[t]he position of any faculty member terminated as a result of Financial Exigency will not be filled within three years, unless that faculty member is offered reinstatement and a reasonable time in which to accept or decline."

**D. The Financial Exigency Declaration and the Presidential Charge**

33.    On September 28, 2023, President Archer publicly declared that CBU was in a state of financial exigency. Before making this declaration, President Archer did not implement the

procedures set out in Appendix G.2 of the Faculty Handbook, which includes a set of cost-cutting actions that should have been taken before the declaration of financial exigency.

34.    On October 12, 2023, President Archer issued a written charge to the Retrenchment Committee, which was publicly posted to CBU's website. That charge directed the Committee to complete its program elimination recommendations by October 30, 2023—compressing the entire recommendation process into approximately eighteen days. The charge expressly stated that the Committee would "determine the numbers, not the personnel," and that personnel termination recommendations would be made by "Department Chairs, acting with the advice and consent of the Deans and Vice President for Academics, subject to the President's approval." Although elected faculty representatives served on the Retrenchment Committee, the Committee's charge expressly excluded it from personnel selection. Provost Lydia Rosencrants served as an ex-officio member of the Retrenchment Committee. On October 26, the Committee provided Archer with its preliminary list of recommended program eliminations and faculty position numbers. On October 27, the Committee met with the Academic Council to establish the number of positions to be eliminated in each school.

35.    On October 31, 2023, President Archer issued a written directive to School of Arts Department Chairs and Deans (the "Presidential Charge"). The Presidential Charge stated expressly that the Retrenchment Committee had already made its recommendations, that the Academic Council had already met to establish the number of positions to be eliminated in each school, and that "[t]his has occurred." The October 31 directive announced the resulting position-elimination numbers and provided instructions for how Chairs and

Deans were to make individual faculty retention recommendations. A copy of the Presidential Charge is attached as Exhibit H.

36.    The Presidential Charge declared that Appendix G.3.e criterion (3)—"the goals of the University regarding numbers of women, women religious, and members of minority groups"—was "not applicable." Archer's stated rationale was that CBU "does not have 'goals' with respect to these categories" and "does not have such targets for faculty or staff hiring," and therefore that retention recommendations "should be made irrespective of gender and race."

37.    The Faculty Handbook's amendment procedures require Faculty Assembly approval for modifications to faculty governance policies. President Archer did not seek or obtain Faculty Assembly approval before declaring criterion (3) inapplicable.

38.    The Presidential Charge also directed that individual faculty retention decisions be based on seniority. The Handbook states criterion (2) as "merit, versatility, seniority."

39.    On November 16, 2023, the Retrenchment Committee submitted its final report to President Archer. Its recommendations did not total the Board's mandated $4 million reduction. In a November 27, 2023 public communication, Archer acknowledged that the Committee had declined to continue its work and had asked that he work with the Deans instead. Archer then worked directly with the Deans to identify additional cuts—including the individual faculty terminations that followed—without further faculty-governance involvement.

40.    At the time of the retrenchment, Dr. Johnson was the only tenured female faculty member in the Department of Religion and Philosophy who specialized in philosophy.

41.     When the retention criteria as modified by the Presidential Charge were applied to the Department of Religion and Philosophy, the result was as follows: Philip Maloney, the only other tenured philosopher in the department, was retained. Dr. Johnson, the only tenured female philosopher in the department, was terminated. Bruce Cinquegrani, untenured and least senior in the department, was retained. Dr. Johnson, tenured and with more seniority than Cinquegrani, was terminated. At the conclusion of the retrenchment process, every tenured faculty member remaining in the Department of Religion and Philosophy was male.

**E. The December 7, 2023, Termination Meetings**

42.     On December 7, 2023, President Archer and School of Arts Dean Tawny LeBouef Tullia conducted a series of meetings with faculty members whose positions had been selected for elimination. No representative of CBU's Office of Human Resources was present at these meetings.

43.     Dr. Johnson attended her termination meeting on December 7, 2023. She made an audio recording of the meeting, which she retains in her possession. CBU has previously received a copy of both the recording and a transcription of it.

44.     In the meeting, President Archer stated that Dr. Johnson's position was being terminated for two reasons: (1) the Philosophy major was being eliminated, and (2) Dr. Johnson was the most junior person in her department. Visiting Assistant Professor Bruce Cinquegrani, who was untenured and had less seniority, was not terminated.

45.     The Faculty Handbook's Appendix G.3.d provides: "It is not intended that across-the-board terminations be made, but that each one involve rational judgments of what is possible, equitable, and the least damaging to the mission of the University." During the meeting,

Dr. Johnson asked President Archer to explain how her termination served to "relieve financial exigency," as the Handbook requires. As reflected in the transcript, Archer stated that the decision to terminate "specific positions" or "specific people" was not based on which terminations would most relieve the exigency.

46.   Karl Leib was a male Professor of Political Science at CBU. The Political Science major was in the same administrative unit—for retrenchment purposes, the School of Arts—and the major was also discontinued in the 2023 retrenchment. Professor Leib was scheduled for a meeting with President Archer and Dean Tullia on the day of the termination meetings. Professor Leib's meeting was canceled at the last minute. Like Dr. Johnson, Leib was a tenured professor whose academic program was discontinued in the 2023 retrenchment; unlike Dr. Johnson, he was not terminated.


**F. The Haught Course Reassignment**

47.   Paul Haught is a philosopher and former member of the Department of Religion and Philosophy at CBU. At least five years before the events at issue in this case, Dr. Haught moved from a faculty position to an administrative role as Vice President of Academic Affairs ("VPAA"). When Dr. Haught transitioned to administration, Dr. Johnson was hired to teach his courses. Dr. Johnson's position was subsequently converted to a tenure-track line, and Haught's former courses became part of her permanent teaching assignment.

48.   On October 25, 2023, President Archer issued a public communication to the CBU campus community announcing a restructuring of administrative positions. That communication stated that Paul Haught would "return to a faculty position." During the period between November and December 2023, Department Chair James Wallace informed Dr. Johnson by email that Haught would be reassigned to the Department of Religion and Philosophy.

14

49.    Also during the period between November and December 2023, School of Arts Dean Tullia directed Chair Wallace to reassign one of Dr. Johnson's Spring 2024 courses to Dr. Haught. Chair Wallace informed Dr. Johnson of this reassignment by email. The reassigned course was already fully enrolled at the time it was reassigned, and Dr. Johnson had been listed as the instructor of record when students registered for it. Dr. Haught had not served as a classroom instructor for at least five years.

50.    On December 7, 2023, Dr. Johnson's position was eliminated. Before that date, CBU had already taken concrete steps toward placing Haught in a faculty role in her department: a fully enrolled course from Dr. Johnson's Spring 2024 schedule had been reassigned to Haught on Dean Tullia's directive, and Chair Wallace had informed Dr. Johnson by email that Haught would eventually be assigned to the Department of Religion and Philosophy. Haught resigned at the end of the Fall 2023 semester before teaching the reassigned course. When Haught resigned, Dr. Johnson was not offered reinstatement.

51.    Appendix G.3.g.5 of the Faculty Handbook provides that "[t]he position of any faculty member terminated as a result of Financial Exigency will not be filled within three years, unless that faculty member is offered reinstatement and a reasonable time in which to accept or decline." Dr. Johnson was not offered reinstatement. Additionally, Section 2.2.5 of the Faculty Handbook provides that administrators seeking to return to faculty status must undergo a formal departmental evaluation and recommendation process through the Dean and VPA. When Dean Tullia directed Chair Wallace to reassign Dr. Johnson's course to Haught, that process was not followed.

**G. The Retention of Bruce Cinquegrani**

52.    Bruce Cinquegrani held the rank of Visiting Assistant Professor in the Department of Religion and Philosophy at the time of the retrenchment. He was not tenured. He is a Catholic priest but is not a member of the De La Salle Christian Brothers. Cinquegrani joined CBU as a full-time faculty member in 2015. Dr. Johnson was hired at CBU in 2014 and therefore had greater seniority than Cinquegrani.

53.    Cinquegrani was retained. Dr. Johnson, who was tenured and had greater seniority than Cinquegrani, was terminated.

54.    Cinquegrani's teaching responsibilities were confined to the religion curriculum. He did not teach philosophy courses.


**H. Faculty Governance and the Retrenchment Committee**

55.    Appendix G.3.b of the Faculty Handbook requires the Retrenchment Committee to include at least two faculty members elected by the entire faculty body. Elected faculty representatives did serve on the Retrenchment Committee. However, as reflected in President Archer's October 12, 2023, charge to the Committee, the Committee's role was expressly limited to recommending program eliminations and determining the number of positions to be cut. The selection of specific faculty members for termination was assigned exclusively to School of Arts Department Chairs, Deans, and the VPA—none of whom were elected faculty representatives.

56.    The American Association of University Professors ("AAUP") investigated CBU's 2023 retrenchment process. On July 30, 2024, AAUP staff member Mark Criley sent a letter to CBU President Br. Chris Englert raising concerns about CBU's compliance with its own Handbook procedures and with AAUP-recommended standards. A copy of the July 30, 2024, letter is attached as Exhibit D (ECF 2-2).

57.    During the FRC appeal process, FRC member Professor Benjamin R. Jordan documented
in a January 31, 2024, email—a copy of which was transmitted to Dr. Johnson and which
she retains in her possession—that School of Arts Dean Tullia had informed the FRC Chair
that President Archer pre-determined the number of faculty to be cut, and that the
Retrenchment Committee pre-determined the number of those cuts to be taken from each
School before meeting with the Academic Council. Jordan also documented that Faculty
Assembly President Philip Maloney had confirmed that the Academic Council was not
included in deliberations about distributing faculty cuts across the four Schools, and that
Maloney possessed written evidence that President Archer's public statement that the
Board of Trustees "mandated" that $3 million in cuts come specifically from faculty lines
was false.

## I. The Faculty Review Committee Appeal

58.    On December 15, 2023, Dr. Johnson notified the Faculty Review Committee of her
intention to file an appeal. On December 18, 2023, she formally submitted her written
appeal to each FRC member. Her appeal raised all three grounds for appeal recognized by
the Handbook—defective procedure, pertinent evidence not previously available, and
arbitrary and capricious action. Among other contentions, the appeal identified President
Archer's unilateral elimination of the Handbook's gender-based retention criterion as
inconsistent with the Handbook's requirements and the University's stated mission. Dr.
Johnson retains a copy of the appeal in her possession.

59.    Scott Geis was appointed Chair of the Faculty Review Committee. At the time of his
appointment, Geis was a tenured Professor of Religious Studies in the Department of
Religion and Philosophy—the same department whose retrenchment decisions were under

review in Dr. Johnson's appeal. Geis had previously served as Dean of the School of Arts, the role then held by Dean Tullia, and as Chair of the Department of Religion and Philosophy, the role then held by Chair Wallace. Both Tullia and Wallace had participated in the retrenchment process that resulted in Dr. Johnson's selection for termination. Geis had also been retained in that same retrenchment process. A finding that the process was procedurally defective—one of the three express grounds for appeal under the Handbook— would have had potential implications for the decisions made regarding Geis's own position. Dr. Johnson's appeal was assigned to a chair who had institutional, departmental, and personal ties to the very process he was charged with evaluating.

60.    In his January 23, 2024, email to Dr. Johnson confirming a hearing date, Geis stated that if Dr. Johnson brought an attorney as her advisor, "the Committee will also have legal counsel present." The Faculty Handbook contains no provision for administration legal counsel to be present at a faculty appeal hearing. In that same email, Geis stated that the Committee would hold separate hearings with Dr. Johnson and with "President Archer or his designee." The Faculty Handbook's appeal provision states that the aggrieved party has the right to "confront adverse witnesses" at the hearing. A procedure separating Dr. Johnson from the administration's witness foreclosed that right. Dr. Johnson retains a copy of this email in her possession.

61.    After several delays in scheduling Dr. Johnson's hearing, Geis informed Dr. Johnson by email on January 10, 2024, that the FRC would hold her initial hearing on Friday, January 19, 2024, at 4:30 p.m. In that same email, Geis confirmed that the signing deadline for CBU's severance agreement was Monday, January 21, 2024. The FRC's written recommendation is delivered to the Board of Trustees, which issues the final decision. A

hearing beginning at 4:30 p.m. on a Friday, with a signing deadline the following Monday, would not allow sufficient time for the FRC to deliberate, issue a written recommendation, transmit it to the Board of Trustees, and receive a final decision before Dr. Johnson's severance deadline.

62.    On January 11, 2024, Dr. Johnson asked Geis directly, in writing and copied to all FRC members, to confirm that the Committee understood: (a) that the deadline for her decision regarding the severance agreement was January 21, 2024, and (b) that the only hearing date the FRC had offered her was less than 48 hours before that deadline. Geis replied, copied to all FRC members, confirming "Yes" to both conditions.

63.    The severance and separation agreement CBU offered Dr. Johnson contained a clause requiring her to certify, as a condition of signing, that there were "no pending complaints, grievances, charges, or lawsuits filed by Employee against the University." The FRC had scheduled Dr. Johnson's initial hearing for January 19, 2024—two days before the severance signing deadline of January 21—and had not indicated when a decision would issue. On January 19, 2024, the FRC did not hold a hearing of Dr. Johnson's appeal. On January 23, 2024, Dr. Johnson sent an email to Geis, copied to Rosencrants, Maloney, Golightly, and all FRC members, stating that she would be "legally prohibited from pursuing the grievance" because of the restrictions imposed by CBU's severance agreement. Dr. Johnson withdrew her FRC appeal and signed the severance agreement before the January 21 deadline.

64.    On January 23, 2024, Geis sent Dr. Johnson an email confirming a hearing for January 26, 2024. Dr. Johnson informed Geis and all FRC members by email that same day that, because of the Committee's repeated postponements and delays, she and her faculty

counsel would not be in attendance for any January 26 meeting. The FRC never held a hearing of Dr. Johnson's appeal at any point.

65.    On January 26, 2024, FRC member Professor Benjamin R. Jordan sent an email to Faculty Assembly President Philip Maloney, copied to all FRC members and to Dr. Johnson. Dr. Johnson retains a copy of this email in her possession. In that email, Jordan stated the following:

(a)    Jordan was "surprised" to learn that Provost Lydia Rosencrants had been trying to help get the FRC "back on track" as of January 9, 2024—an involvement of which Jordan had not been informed and about which Rosencrants had not spoken to the full committee;

(b)    Geis had "spent considerable time responding to and discussing the FRC's work and its current Appeal from Dr. Johnson with multiple unspecified people not on the Committee who have approached him (or whom he has approached)" without the permission or previous knowledge of the other four FRC members; and

(c)    This pattern of communications "may have also contributed to the Committee's repeated delays and rescheduling of appointments" with Dr. Johnson. Jordan's email further noted that FRC members had communicated and met during the holiday period itself—the same period CBU may contend caused the delays—and that the delays continued after the holidays had ended.

66.    On January 29, 2024, Dr. Johnson revoked her severance agreement within the seven-day rescission window. After Dr. Johnson's revocation, CBU scheduled no further FRC hearing, issued no written decision on her appeal, and transmitted no recommendation to the Board of Trustees.

67.    On January 31, 2024, Jordan sent a further email to all FRC members, to Faculty Assembly President Philip Maloney, and to Dr. Johnson, a copy of which she retains in her possession. That email documented that at a recent FRC meeting, Geis had declared that the Committee would not evaluate whether the financial exigency procedures were defective—thereby eliminating one of the three express Handbook grounds for appeal—and that only Geis would be permitted to speak at that meeting, with all other FRC members directed to submit their views privately to Geis. Jordan further documented that when he raised objections to these directives, Geis abruptly left the meeting and did not return or communicate with the Committee for more than three days. Jordan also documented that at the FRC's first meeting, after the members had read Dr. Johnson's appeal, Geis had stated—and Jordan recorded in contemporaneous notes—"Leigh's case will open a Pandora's Box for other faculty," and subsequently, "This case will set a precedent."

## J. The Severance Agreement

68.    The severance and separation agreement CBU offered Dr. Johnson provided seven months of base salary ($32,044) in exchange for a full release of all legal claims. The agreement required signature by January 21, 2024—forty-six days after the December 7, 2023, termination notification.

69.    Dr. Johnson rescinded her signature within the seven-day rescission window provided by the agreement and by applicable law.

70.    After Dr. Johnson's revocation, CBU paid her no severance. Upon information and belief, CBU also took action following Dr. Johnson's revocation that adversely affected her eligibility for Public Service Loan Forgiveness.

**K. Events Following Termination Notice: Spring 2024**

71.    Dr. Johnson remained a CBU employee through her termination effective date of May 11,

        2024.

72.    During Spring 2024, CBU excluded Dr. Johnson from departmental meetings,

        departmental communications, and departmental decision-making.

73.    During Spring 2024, Faculty Assembly President Philip Maloney informed Dr. Johnson

        that she would not be recognized to speak at Faculty Assembly meetings.

74.    On April 26, 2024—the last day of the semester and Dr. Johnson's final day in the

        classroom after nearly twenty years of teaching—School of Arts Dean Tawny LeBouef

        Tullia removed Dr. Johnson from her classroom at the start of her 11:00 a.m. class, telling

        her the interruption would take only a minute. Dean Tullia escorted Dr. Johnson to her

        office, where Acting President Ron Brandon and a Memphis Police Department officer

        were waiting. No one in the meeting explained to Dr. Johnson who had filed a report about

        her social media post or who had contacted the Memphis Police Department. Brandon

        showed Dr. Johnson a copy of a social media post she had published four days earlier,

        which read: "Starting my final week in the classroom tomorrow. It's been a good 20yr run

        and I think I made a positive impact on at least a few hundred students' lives. Plan on going

        out with a bang." The post was accompanied by a firecracker emoji. Brandon suggested

        the post indicated that Dr. Johnson was a threat to campus. Dr. Johnson asked everyone

        present whether they were familiar with the phrase "go out with a bang" as a common

        expression meaning a celebratory conclusion; all said yes. Brandon then claimed the emoji

        depicted a stick of dynamite rather than a firecracker; Dr. Johnson corrected him. Having

        acknowledged the meaning of the phrase and been corrected on the emoji, Brandon

nonetheless continued the meeting and asked Dr. Johnson to take a seat. Dr. Johnson declined, noted that her students were waiting, and asked Brandon directly whether he believed she was a threat. Brandon did not answer. Dr. Johnson asked the Memphis Police Department officer the same question; he deferred to Brandon. Dr. Johnson informed the group that she was returning to her class, invited them to search her bag and car in the meantime, and left. She returned to her classroom and voluntarily informed her students of what had occurred. CBU took no action to prevent her from returning to the classroom or completing her class—conduct inconsistent with any genuine belief that she posed a safety risk. Dr. Johnson was never provided a written report, incident documentation, or any other formal record of the April 26 meeting or its stated basis.

75.    On May 10, 2024, Dr. Johnson filed her initial EEOC charge of discrimination, Charge No. 490-2024-02322.

76.    On or around May 11, 2024, CBU campus security personnel interfered with Dr. Johnson's retrieval of personal belongings from her office on campus.

**L. The AAUP Inquiry and CBU's Response**

77.    The American Association of University Professors ("AAUP") investigated CBU's 2023 retrenchment process. On July 30, 2024, AAUP staff member Mark Criley sent a letter to CBU President Br. Chris Englert raising concerns about CBU's compliance with its own Handbook procedures and with AAUP-recommended standards. A copy of the July 30, 2024, letter is attached as Exhibit D (ECF 2-2).

78.    The AAUP's July 30, 2024, letter identified the following concerns, among others: whether the financial exigency threshold was met; a public statement by CBU leadership that the University was operating "in the black"; the absence of elected faculty body participation

in the retrenchment process; the absence of a pre-termination hearing; and whether terminated faculty received at least a year's notice or equivalent severance.

79.   CBU, through President Englert, responded by describing the bodies involved in the retrenchment process as the Academic Council, the President's Cabinet, and the Planning Committee.

80.   On September 30, 2024, the AAUP replied to President Englert, noting that CBU's actions in Dr. Johnson's case appeared not to adhere to any of the three key elements of AAUP-recommended standards regarding termination of faculty appointments for financial exigency. Those standards require: (1) that the financial circumstances constitute a bona fide exigency—specifically, "a crisis that fundamentally compromises the academic integrity of the institution"; (2) that an elected faculty committee has an appropriate role in determining whether conditions of exigency exist, and that the faculty or an elected faculty body plays the primary role in decisions about where academic program cuts are to be made; and (3) that affected individual faculty members receive appropriate due process and consideration. The AAUP rejected CBU's characterization of these standards as "important guidelines" adaptable to each institution's "unique needs," stating that substantive departures from AAUP-recommended standards "put academic freedom and tenure in serious jeopardy." With respect to element (3) specifically, the AAUP noted that Dr. Johnson reported receiving no effort to find her a suitable alternative position, no year's notice or severance salary, and—most critically—no prior hearing before a faculty committee in which she could contest the elements of her termination, adding that all of these are "crucial components not only of AAUP-recommended standards but of CBU's own regulations." The letter closed: "We therefore continue to urge you to reinstate

Professor Johnson to her tenured appointment and to adhere to the standards outlined above in any future action addressing the university's financial difficulties." The letter was copied to Provost Rosencrants, Dean Tullia, and Chair Wallace. A copy of the AAUP's September 30, 2024, letter is attached as Exhibit I.

## M. Damages

81.     Dr. Johnson's employment at CBU ended on May 11, 2024. Due to the timing of her termination relative to the academic hiring cycle, she was unable to obtain comparable academic employment before the start of the Fall 2025 academic year, despite actively seeking employment from the date of her termination through the date she began her new position.

82.     Beginning in Fall 2025, Dr. Johnson obtained a position as an untenured Assistant Professor at American University in Washington, D.C. This position is at a lower academic rank than the tenured Associate Professor rank she held at CBU.

83.     Following her termination notification, Dr. Johnson actively sought alternative employment throughout the period of her unemployment. Between May and September 2024, she applied to nearly one hundred non-academic positions. The academic faculty hiring cycle runs from October through March; during those months she applied to academic positions while continuing to apply for non-academic work as well. She moved to Washington, D.C. in July 2025 and began her new academic position in August 2025. At no point during the period between her termination and her new employment did Dr. Johnson cease actively searching for work.

84.     Dr. Johnson has suffered economic losses including lost wages and benefits from May 11, 2024, through the start of her employment at American University; ongoing salary

differential between her CBU compensation and her current compensation; loss of retirement contributions; and forfeiture of the severance CBU conditioned on a full release of all legal claims. She has also suffered non-economic harm including emotional distress, reputational injury, and significant disruption of her academic career. As a direct result of CBU's termination of her tenured position, Dr. Johnson must now rebuild her academic career from a non-tenured position, and she must begin the tenure process over again from the start. At CBU, she had earned tenure in 2018. She will not be eligible to earn tenure at American University until approximately 2032—placing her career trajectory years behind where it would have been absent CBU's unlawful conduct, and imposing a permanent and material diminishment of her long-term academic career prospects.

85.    Dr. Johnson's average annual compensation at CBU from 2018 through 2023, as reflected in her W-2 earnings, was approximately $62,818. Her back pay losses for the period from June 2024, through August 2025—approximately fourteen months—total approximately $73,288, exclusive of lost benefits and retirement contributions. Dr. Johnson's current position at American University is at a lower salary than her CBU compensation; the resulting front pay differential will continue to accrue for the foreseeable future and will be established through evidence at trial.

**VI. CAUSES OF ACTION**

**COUNT I**

**Title VII of the Civil Rights Act of 1964 – Sex Discrimination**

**42 U.S.C. §§ 2000e et seq.**

86.   Dr. Johnson incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

87.   At all relevant times, CBU was an employer within the meaning of Title VII, and Dr. Johnson was an employee within the meaning of Title VII.

88.   Dr. Johnson is female. She was qualified for the position she held. She was terminated. CBU retained similarly situated male employees.

89.   CBU intentionally discriminated against Dr. Johnson on the basis of her sex in the terms, conditions, and privileges of her employment, including the decision to terminate her employment.

90.   The discriminatory acts include but are not limited to the following:

(a)   CBU terminated Dr. Johnson while retaining Philip Maloney, a male philosopher with practically identical academic training, in the same department and under the same retrenchment process. Dr. Johnson was more versatile than Maloney—she could teach the same departmental curriculum that Maloney could as well as in-demand courses for non-majors that Maloney could not cover—and her student credit hour productivity was higher. The Handbook requires that merit, versatility, and seniority be considered together as criterion (2), in that order of emphasis. CBU treated seniority alone as determinative, ignoring the merit and versatility factors that the Handbook lists first and that favored Dr. Johnson. CBU selected Dr. Johnson for termination and retained Maloney.

(b)   CBU issued the Presidential Charge, which declared criterion (3) of the Handbook—the only retention criterion that explicitly accounted for gender—"not applicable" on the stated ground that CBU "does not have goals" regarding

representation of women. That rationale eliminated the only structural protection in the Handbook against sex-skewed outcomes from retrenchment decisions, at the precise moment when terminating Dr. Johnson would produce an all-male department. Emily Holmes, the only other tenured woman in the Department of Religion and Philosophy, had resigned approximately one week before the December 7, 2023, termination meetings. CBU made the decision to eliminate criterion (3) with knowledge that Dr. Johnson was the last remaining tenured female faculty member in the department. The Presidential Charge's directive to proceed "irrespective of gender" removed the one mechanism designed to prevent the discriminatory outcome that followed. This modification was made without Faculty Assembly approval and before the Retrenchment Committee had made any personnel recommendations.

(c)     CBU retained Bruce Cinquegrani, an untenured male Visiting Assistant Professor who joined CBU in 2015, while terminating Dr. Johnson, a tenured female Associate Professor who had been employed at CBU since 2014. Cinquegrani was retained; Dr. Johnson was terminated. The Handbook's first retention criterion is tenure.

(d)     CBU scheduled a termination meeting on December 7, 2023, for Karl Leib, a male Professor of Political Science whose major was also discontinued in the same retrenchment unit, the School of Arts. That meeting was canceled at the last minute. Leib was not terminated. Dr. Johnson's meeting proceeded, and she was terminated.

(e)     Before Dr. Johnson's effective termination date, CBU had already taken concrete

steps toward placing Paul Haught, a male administrator, in a faculty role in Dr.

Johnson's department. Haught was retained in a faculty role; Dr. Johnson was

terminated. When Haught subsequently resigned, Dr. Johnson was not offered

reinstatement.

91.    Sex was a motivating factor in CBU's decision to terminate Dr. Johnson's employment.

92.    As a direct and proximate result of CBU's unlawful discrimination, Dr. Johnson has

suffered and continues to suffer economic losses, non-economic harm, emotional distress,

and damage to her career and professional reputation, in amounts to be proven at trial.

93.    Dr. Johnson is entitled to back pay, front pay, compensatory damages, punitive damages,

attorney's fees, costs, and all other relief available under Title VII.

**COUNT II**

**Title VII of the Civil Rights Act of 1964 – Retaliation**

**42 U.S.C. §§ 2000e-3(a) et seq.**

94.    Dr. Johnson incorporates by reference the allegations of all preceding paragraphs as if fully

set forth herein.

95.    Dr. Johnson engaged in activity protected under Title VII on the following occasions:

(a)    On December 15, 2023, she notified the Faculty Review Committee of her intent

to file an appeal, and formally filed that appeal on December 18, 2023. Although

the appeal did not use the term "sex discrimination," it opposed conduct Dr.

Johnson reasonably believed constituted an unlawful employment practice:

specifically, the Presidential Charge's directive to make retention decisions "irrespective of gender"—eliminating the only Handbook criterion that accounted for the representation of women—at the precise moment when doing so would foreseeably produce an all-male department. The appeal identified this directive as inconsistent with the Handbook's requirements and the University's stated mission;

(b)    On January 29, 2024, she revoked the severance agreement, which had been conditioned on a full release of all legal claims including sex discrimination claims;

(c)    On May 10, 2024, she filed a charge of discrimination with the EEOC; and

(d)    On October 25, 2024, she filed an Amended EEOC Charge adding retaliation.

96.    Following one or more of these protected activities, CBU took the following materially adverse actions. Each action described below was one that would have dissuaded a reasonable employee from making or supporting a charge of discrimination, as required by Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006):

(a)    Following Dr. Johnson's December 2023 internal appeal, the FRC chair communicated ex parte with administration officials without the knowledge of other committee members, repeatedly postponed or delayed Dr. Johnson's hearing, and ultimately declared that the Committee would not evaluate whether the financial exigency procedures were defective, eliminating one of the three express Handbook grounds for appeal. No hearing of Dr. Johnson's appeal ever occurred;

(b)      Following Dr. Johnson's January 29, 2024, revocation of the severance

agreement, CBU abandoned the FRC appeal entirely and paid no severance. Prior

to Dr. Johnson's execution of the severance agreement, her then-counsel

communicated to CBU's counsel that Dr. Johnson's student loans were on track

for forgiveness under the Public Service Loan Forgiveness ("PSLF") program in

August 2025, and that a termination date of May 11, 2024, would both reduce her

qualifying payment count and render her ineligible for the PSLF program. In

connection with the execution of the severance agreement, CBU agreed to

designate Dr. Johnson's official termination date as August 1, 2024. Following

Dr. Johnson's revocation of the severance agreement, CBU did not honor that

agreement and maintained a termination date of May 11, 2024. As a result, Dr.

Johnson was rendered ineligible for the PSLF program from May 2024 through

August 2025, when she became employed at a qualifying institution;

(c)      During Spring 2024, CBU excluded Dr. Johnson from departmental meetings,

communications, and decision-making;

(d)      During Spring 2024, Faculty Assembly President Philip Maloney informed Dr.

Johnson that she would not be recognized to speak at Faculty Assembly meetings;

(e)      On April 26, 2024, CBU removed Dr. Johnson from her classroom on the last day

of the semester—her final day of teaching—based on a social media post that

used the common phrase "go out with a bang" accompanied by a firecracker

emoji. A Memphis Police Department officer was present at the meeting. Acting

President Brandon acknowledged understanding the meaning of the phrase and

accepted correction on the emoji, but continued to detain Dr. Johnson and

declined to answer when she asked directly whether he believed she was a threat. CBU took no action to prevent Dr. Johnson from returning to her classroom and completing her class. Dr. Johnson voluntarily informed her students of the circumstances of her removal. Dr. Johnson was never provided any written report or incident documentation. The stated basis for this action was pretextual; the conduct was designed to remove Dr. Johnson from her classroom under suspicious circumstances on her last day of teaching and to damage her standing with her students; and

(f)    On or around May 11, 2024, CBU security personnel interfered with Dr. Johnson's retrieval of personal property from her office on campus.

97.    Dr. Johnson's protected activities were a motivating factor in CBU's decision to take each of the adverse actions described above.

98.    The temporal proximity between each protected activity and each adverse action, and the pattern of escalating adverse treatment following Dr. Johnson's protected activities, establish a causal connection between the protected activity and the retaliation.

99.    As a direct and proximate result of CBU's unlawful retaliation, Dr. Johnson has suffered and continues to suffer economic losses, non-economic harm, emotional distress, and damage to her career and professional reputation, in amounts to be proven at trial.

100.    Dr. Johnson is entitled to back pay, front pay, compensatory damages, punitive damages, attorney's fees, costs, and all other relief available under Title VII.

**COUNT III**

**Breach of Contract**

101.   Dr. Johnson incorporates by reference the allegations of all preceding paragraphs as if fully set forth herein.

102.   CBU and Dr. Johnson were parties to annual employment contracts, the most recent of which was the 2023–2024 Faculty Appointment Contract. CBU's answer in this action admits the existence of the employment contract and that the Faculty Handbook governs the terms and conditions of faculty employment.

103.   The Faculty Handbook, as incorporated into Dr. Johnson's employment contracts, constitutes a binding contractual obligation governing the conditions under which CBU may terminate a tenured faculty member.

104.   CBU breached its contractual obligations in the following respects, among others:

   (a)   President Archer declared Appendix G.3.e criterion (3) inapplicable without Faculty Assembly approval, and the Chairs and Deans who made individual retention recommendations were provided a version of the criteria from which criterion (3) had been removed;

   (b)   CBU retained Bruce Cinquegrani, an untenured faculty member with less seniority than Dr. Johnson, over Dr. Johnson, a tenured faculty member, in violation of the Handbook's mandatory first criterion under Appendix G.3.e;

   (c)   CBU applied seniority as the determinative retention criterion without first giving proper weight to merit and versatility, as required by the mandatory ordering of criterion (2) under Appendix G.3.e;

   (d)   CBU made no effort to find alternative employment for Dr. Johnson within the institution, in violation of Appendix G.3.c and Section 2.7.3.1;

(e)     CBU provided approximately five months' notice of termination, less than the usual notice contemplated by Appendix G.3.g.1, and conditioned the only severance offered on a full release of all legal claims rather than providing severance commensurate with length of past and potential service as required by Appendix G.3.g.2;

(f)     CBU conducted the FRC appeal through a chair with material conflicts of interest, allowed ex parte communications between the chair and administration officials without the knowledge of other committee members, repeatedly postponed or delayed Dr. Johnson's hearing such that no hearing of her appeal ever occurred, threatened that administration legal counsel would be present if Dr. Johnson exercised her Handbook right to bring an advisor, structured separate hearings that foreclosed Dr. Johnson's right to confront adverse witnesses, limited the committee's scope of review to exclude evaluation of procedural defects—one of three express Handbook grounds for appeal—and abandoned the appeal entirely after Dr. Johnson revoked her severance agreement, in violation of Appendix G.3.g.3 and Section 2.7.3.4; and

(g)     CBU planned to fill Dr. Johnson's position with a reassigned administrator within three years of her termination, without offering her reinstatement, in violation of Appendix G.3.g.5.

105.   As a direct and proximate result of CBU's breaches of contract, Dr. Johnson suffered economic harm including lost income, lost benefits, lost retirement contributions, forfeiture of severance, and disruption of her academic career, in amounts to be proven at trial.

## VII. DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Leigh M. Johnson respectfully requests that this Court:

1.      Enter judgment in favor of Plaintiff on all Counts;

2.      Award back pay, including lost wages, lost benefits, and lost retirement contributions, from the date of Plaintiff's termination through the date of judgment;

3.      Award front pay and other prospective economic relief to compensate Plaintiff for future economic losses resulting from CBU's unlawful conduct, including losses arising from the truncation of her academic career and the delay in her tenure eligibility;

4.      Award compensatory damages for emotional distress, reputational harm, and other non-economic losses resulting from CBU's unlawful conduct, in amounts to be proven at trial;

5.      Award punitive damages as permitted by 42 U.S.C. § 1981a for CBU's violations of Title VII committed with malice or with reckless indifference to Plaintiff's federally protected rights;

6.      Award Plaintiff reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

7.      Award pre- and post-judgment interest as permitted by law; and

8.      Grant such other and further relief as this Court deems just and proper.


Respectfully submitted,

/s/ Dr. Leigh M. Johnson

Dr. Leigh M. Johnson

Plaintiff, Pro Se

1492 Newton Street NW, Apt. A

Washington, DC 20010

(901) 679-5937

drleighmjohnson@gmail.com

Dated: March 10, 2026