# EXHIBIT D

Plaintiff's Rule 37 Meet-and-Confer Letter (substantive deficiencies), April 27, 2026

Johnson v. Christian Brothers University
Case No. 2:25-cv-02618-BCL-atc

April 27, 2026

Stephen W. Vescovo, Esq.
Jamie Gibber, Esq.
Lewis Thomason, P.C.
2900 One Commerce Square
40 South Main Street
Memphis, Tennessee 38103

*Via electronic mail to:* svescovo@lewisthomason.com; jgibber@lewisthomason.com

**Re:** *Johnson v. Christian Brothers University*, **No. 2:25-cv-02618-BCL-atc (W.D. Tenn.)**

**Plaintiff's Rule 37 Letter Regarding Deficiencies in Defendant's Responses to First Requests for Production and First Requests for Admission**

Dear Counsel:

I write pursuant to Federal Rule of Civil Procedure 37(a)(1) and Local Rule 7.2(a)(1)(B) to confer with you regarding multiple deficiencies in Defendant's Responses to Plaintiff's First Requests for Production ("RFP Responses") and Defendant's Answers to Plaintiff's First Requests for Admission ("RFA Answers"), both served on April 24, 2026. The deficiencies are substantial and, in several instances, squarely contradicted by Defendant's own production. I note that Defendant's responses were certified under Federal Rule of Civil Procedure 26(g)(1). Plaintiff requests that Defendant cure those deficiencies outlined below.

As I have stated previously, I remain willing to confer promptly and in good faith by written correspondence. I respectfully ask that Defendant's counsel address the issues below in writing by **5:00 p.m. Eastern / 4:00 p.m. Central on Friday, May 8, 2026**. If Defendant does not provide a written response addressing or curing each item below, I intend to seek relief from the Court, including a motion to compel under Rule 37(a) and any other appropriate relief. I reserve all rights.

**I. Documents and Communications Withheld Pending Protective Order**

Defendant repeatedly states that it will supplement its production once a protective order is entered. See, e.g., Responses to RFP Nos. 4, 5, 12, 15, 20, 25, and 49. CBU's responses to RFP Nos. 14 and 18 present an additional problem: the objections invoke protective-order-based withholding, but the responses then state that no responsive or additional responsive documents exist. At minimum, Defendant must clarify whether it is withholding any documents on this basis or whether it represents, after reasonable search, that no such documents exist.

I do not object to producing materials that warrant confidentiality protection pursuant to a protective order, but the pendency of competing proposed protective orders does not relieve Defendant of its obligations under Rule 34(b)(2), nor does Defendant's own objection to Plaintiff's proposed protective order justify withholding production indefinitely. Plaintiff recognizes that the competing protective order proposals remain pending before the Court, but that procedural posture does not excuse Defendant's failure to identify the categories and approximate volume of withheld materials, nor does it relieve Defendant of its obligation to produce documents that do not require protective-order treatment. Defendant must, at a minimum, identify with specificity the categories of withheld materials so that I can evaluate whether the asserted basis for withholding is appropriate.

Plaintiff requests that Defendant: (1) identify by category and approximate volume the materials withheld on this basis; (2) provide a date certain by which the supplemental production will be completed (I propose seven days after entry of the order); and (3) confirm in writing that, upon entry of any protective order in this case, Defendant will produce all responsive documents previously withheld on that basis.

## II. Privilege Log

Defendant asserts the attorney-client privilege and/or work-product doctrine in response to RFP Nos. 7, 8, 9, 10, 31, 32, 45, 46, and 47. Yet, Defendant has not produced a privilege log.

Federal Rule of Civil Procedure 26(b)(5)(A) requires that a party withholding information on the basis of privilege or work product "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." My Instructions specifically required a privilege log identifying, at minimum, the date, author, recipient(s), general subject matter, and basis for the claim. *See* Plaintiff's First Requests for Production, Instruction No. 4.

Plaintiff also notes that Defendant's responses to RFP Nos. 8, 9, and 10 do not merely assert privilege; they affirmatively represent that "CBU submits it followed the advice of its outside counsel to ensure it complied with applicable state and federal law." To the extent Defendant intends to rely on counsel's advice as a justification for its treatment of Appendix G.3.e criterion (3), that reliance may affect the scope of any applicable privilege. Plaintiff reserves all rights on that issue.

Plaintiff requests a Rule 26(b)(5)(A)-compliant privilege log identifying every document being withheld on the basis of privilege or work product, by the deadline indicated above.

### III. Internal Contradictions Between Defendant's Production, Its RFA Answers, and Its RFP Responses

#### A. Reassignment of Plaintiff's Spring 2024 course to Paul Haught

Defendant asserts in RFA Answer No. 20 that "Dr. Haught's contract provided that after he left his administrative position, he was to return to his tenured teaching position in the religion and philosophy department." That claim is difficult to reconcile with Defendant's contemporaneous production.

In the email chain produced by Defendant at CBU-069–076, Dean Tullia asked Wallace on November 15, 2023 whether it was time "to take Leigh's name off of one of the 5 courses in the Spring and to re-assign that course and PHIL 219 to Paul Haught?" In that same chain, Wallace later wrote that he was "waiting on something from Paul first and foremost" and that Haught "said something about needing to clarify some things about his new contract." Those communications indicate that not only were Plaintiff's courses already in the process of being reassigned to Dr. Haught before Plaintiff was terminated, but also that Haught's contractual status and alleged return-to-faculty "rights" were still undetermined at the time Plaintiff was being considered for termination and contemporaneous with the reassignment of Plaintiff's Spring 2024 course assignment to Haught.

Plaintiff is therefore entitled to Dr. Haught's then-existing (2023-2024) contract, any proposed or draft "new contract," any amendments or transition memoranda, and all communications between September 2023 and December 2023 concerning the contractual basis asserted for his return to a full-time faculty position in the Department of Religion and Philosophy.

Plaintiff requests production of Dr. Haught's administrative or executive contract, any amendments, any side letters or transition memoranda concerning his return to faculty, all communications referring to the alleged return-to-faculty provision, and any documents indicating how any change to Dr. Haught's contract affected existing tenured-faculty rights secured by the Faculty Handbook. RFP No. 27 calls for these documents.

#### B. Whether Appendix G.3.e criterion (3) was treated as inapplicable

The Presidential Charge to Chairs and Deans (ECF 33-1, PageID 186–87) speaks for itself. It states both that "criteria 3 is not applicable," and then gives the operative instruction: "For this reason, recommendations relating to faculty retention should be made irrespective of gender and race." These phrases from the Presidential Charge were quoted, verbatim, in RFAs 1 and 2.

Defendant cannot both deny that the Presidential Charge made criterion (3) inapplicable and deny that it instructed decisionmakers to disregard gender and race in retention recommendations when the document says both things. Plaintiff therefore requests that Defendant supplement its RFA Answers and additionally produce all non-privileged documents concerning the drafting, approval, interpretation, or implementation of that document, including any communications concerning whether or how Appendix G.3.e criterion (3) was to be applied during the retrenchment process.

## C. Documents identifying attendees at Plaintiff's December 7, 2023 termination meeting

Defendant's RFP Response No. 26 states there are no documents sufficient to show the attendees at my December 7, 2023 termination meeting. That answer is contradicted by Defendant's own document at CBU-202, which appears to identify President Archer as the presenter for the meeting at which my Separation and Transition Agreement was "PRESENTED…ON 12/7/2023." The same document identifies the presenters for the corresponding meetings of every other faculty member then identified for non-reappointment.

Plaintiff requests that Defendant supplement RFP No. 26 to produce any additional records (calendar invitations, scheduling correspondence, follow-up summaries) that identify or were used to identify attendees at the December 7, 2023 termination meetings, including Plaintiff's.

## D. Communications between FRC Chair Geis and individuals outside the Faculty Review Committee

Defendant's answers to RFA Nos. 24 and 25 are irreconcilable. RFA No. 24 asked whether FRC Chair Geis communicated with individuals outside the Faculty Review Committee regarding Plaintiff's appeal during its pendency. Defendant's answer admits only that "Chair Scott Geis communicated with certain members of the Faculty Review Committee regarding scheduling during the appeal" — addressing communications *within* the committee, not the communications *outside* it that the request actually asked about. Yet in the very next answer, Defendant admits RFA No. 25: that Vice-Provost Rosencrants communicated with FRC Chair Geis regarding Plaintiff's appeal during its pendency.

Rosencrants is not a member of the Faculty Review Committee. She is a senior administrator outside the committee. Defendant cannot admit in RFA No. 25 that Geis communicated with a non-member administrator about Plaintiff's appeal and simultaneously avoid admitting in RFA No. 24 that Geis communicated with individuals outside the committee.

Plaintiff requests that Defendant supplement its answer to RFA No. 24 to address communications between FRC Chair Geis and individuals outside the Faculty Review Committee, including but not limited to Vice-Provost Rosencrants, and produce all documents, emails, video recordings, and notes reflecting such communications. This request reinforces, and is independently supported by, the FRC-related production gaps identified in Section VIII of this letter.

## IV. Implausible "No Documents" Claims

Defendant's responses to Plaintiff's First Requests for Production repeatedly direct Plaintiff to the same broad Bates ranges — principally CBU-058–083 and CBU-201–205 — without identifying which specific documents within those ranges Defendant contends are responsive to which specific requests. CBU-058–083 consists primarily of emails concerning the reassignment of Plaintiff's Spring 2024 course to Dr. Haught and a copy of the Separation and Transition Agreement. CBU-201–205 were produced as flattened images rather than in native format, rendering them largely unusable for the comparative analysis they purport to support. Defendant has not identified any specific Faculty Handbook provision that it contends authorized the particular selection decisions at issue, nor has it produced documents showing how the relevant Handbook criteria were applied to Plaintiff or to the retained faculty members.

Despite the repeated cross-referencing of these same document ranges, Defendant responds to numerous other RFP requests by stating that no responsive documents exist. These responses are facially implausible in light of (a) Defendant's own RFA Answers describing how retention decisions were made, and (b) the Retrenchment Committee Report at CBU-215 through CBU-218.

### A. Comparator and criteria-application documents (RFP Nos. 12, 13, 14, 16, 17, and 18)

RFP Nos. 12, 13, and 14 seek distinct categories of documents concerning the retrenchment decisions.

 i.    RFP No. 12 requests all documents concerning the selection of faculty members for termination or retention within the Department in 2023.

 ii.   RFP No. 13 requests the working documents of any comparative process — including ranking sheets, comparison charts, score sheets, matrices, worksheets, notes, draft recommendations, or similar documents — used to compare Department faculty for purposes of retention or termination.

 iii.  RFP No. 14 requests documents reflecting the application of the Handbook's retention criteria — tenure, Christian Brother status, merit, versatility, seniority, or

institutional goals regarding women, women religious, and members of minority races — as applied to Plaintiff or any other faculty member in the Department.

These are not duplicative requests. RFP No. 12 asks what selection/retention documents exist; RFP No. 13 asks what comparative tools or working documents were used; and RFP No. 14 asks how, if at all, the Handbook criteria were applied. Defendant's responses do not answer these requests as written.

RFP Response No. 12 refers Plaintiff to CBU-058–083 and CBU-201–205 and states that Defendant will supplement once a protective order is entered. As noted above, CBU-058–083 consists primarily of emails about the Haught course reassignment and the Separation and Transition Agreement — neither of which concerns the selection of faculty for termination or retention — and CBU-201–205 were not produced in native format. This does not satisfy Defendant's obligation under Rule 34(b)(2)(C) to state whether any responsive documents are being withheld. The cross-reference to broad, largely unresponsive Bates ranges is not a substitute for identifying specific documents that address the request as written.

Defendant's responses to RFP Nos. 13 and 14 present additional problems. Both responses contain apparent cross-referencing errors: RFP Response No. 13 states that "CBU does not possess any documents responsive to Request No. 12," and RFP Response No. 14 states that "CBU does not possess any additional documents that would be responsive to Request No. 12." Neither response addresses the request to which it is nominally responding. These are three distinct requests calling for three distinct categories of documents. Defendant's treatment of them as interchangeable — to the point of answering two of them by reference to a third — undercuts any representation that Defendant conducted a reasonable, request-specific search. At minimum, Defendant must provide a response to each of RFP Nos. 13 and 14 that addresses those requests as written, states clearly whether Defendant possesses responsive documents, and identifies any documents being withheld.

RFP No. 14 requests documents reflecting the application of the Handbook-mandated criteria of (1) tenure or status as a Christian Brother, (2) merit, versatility, and seniority, and (3) institutional goals with regard to women, women religious, or minority races to Plaintiff or any other faculty member in the Department of Religion and Philosophy. Defendant objects to producing documents related to faculty non-retainment until a protective order is entered. But Defendant answered RFA No. 16 by representing that CBU "followed the Faculty Handbook's guidance on the retrenchment process, took into account recommendations by chairs and deans, and then made a decision based on the factors set forth in the Handbook." If Defendant applied the Handbook's factors to reach the decision to terminate Plaintiff's position, documents reflecting that application either exist or they do not. Defendant cannot simultaneously represent that it followed a criteria-based process and claim that no documents reflect that process.

RFP Nos. 16, 17, and 18 each seek basic employment and comparator information — name, sex, rank, tenure status, discipline, teaching assignments, course load, and employment status — for Department of Religion and Philosophy faculty and the five named comparators. Defendant responds to all three by citing the same unusable Bates ranges (CBU-058–083 and CBU-201–205) and stating that CBU "does not have documents" with the requested information or "does not have documents responsive to this request." These responses are difficult to reconcile with CBU's ordinary possession of employment and appointment records for its own faculty and with Defendant's own RFA Answers, including its representation in RFA Answer No. 8 that Bruce Cinquegrani "operates under a year-to-year contract" and its representation in RFA Answer No. 16 that CBU "followed the Faculty Handbook's guidance," "took into account recommendations by chairs and deans," and made decisions "based on the factors set forth in the Handbook." Faculty contracts, appointment letters, course-load records, rank/tenure records, and similar documents either exist or they do not; they should be produced or affirmatively identified as nonexistent after reasonable search. To the extent any documents responsive to these requests are being withheld pending entry of a protective order or on personnel-privacy grounds, Defendant should say so expressly rather than representing that no responsive documents exist.

The Retrenchment Committee Report underscores the need for supplementation. The Report states at CBU-216 that "[t]he Committee carefully identified positions for retrenchment, considering various criteria such as student enrollment in programs, credit hour production per school and department, class size and capacity, employment outcomes, the vision communicated by the President, and the charges to the Committee." That statement strongly suggests the existence of underlying analyses or data on which the Committee relied to identify the 26 positions listed at CBU-217. Those underlying materials are responsive to Plaintiff's requests.

Plaintiff requests that Defendant: (1) provide responses to RFP Nos. 13 and 14 that address those requests as written, rather than by cross-reference to RFP No. 12; (2) clarify whether documents responsive to RFP Nos. 12, 13, 14, 16, 17, and 18 are being withheld pending entry of a protective order or on any other asserted basis; (3) produce all responsive, non-privileged documents; (4) identify by Bates number any documents Defendant contends are responsive to each of RFP Nos. 12, 13, 14, 16, 17, and 18; and (5) confirm that Defendant has searched for the underlying materials referenced or implied by the Retrenchment Committee Report, including enrollment-by-program data, credit-hour-production reports, class-size/capacity data, employment-outcome data, comparator analyses, department-by-department recommendations, ranking sheets, score sheets, matrices, or similar working documents. If Defendant contends that no responsive documents exist for any of these categories, Plaintiff requests that Defendant state that expressly after reasonable search and identify the custodians, repositories, date ranges, and search methods used.

**B. Retrenchment Committee working materials (RFP Nos. 4 and 5)**

Independent of the criteria-application gaps identified above, Defendant's production is also deficient with respect to the Retrenchment Committee's own working materials. Defendant has produced the Retrenchment Committee Report at CBU-215–218, which states that the committee met from October 13 to October 26, 2023, and reflects votes by the voting members on at least nine separate motions. A two-week, thirteen-member committee that votes on at least nine separate motions would ordinarily be expected to generate contemporaneous written materials beyond a final report.

Plaintiff requests production of all materials responsive to RFP Nos. 4 and 5, including (1) the committee's written charge of October 13, 2023; (2) agendas, meeting notes, minutes, and audio/video recordings; (3) drafts of the report and any earlier or alternative position lists; (4) data sets, enrollment summaries, credit-hour reports, and program reviews provided to or generated by the Retrenchment Committee; (5) any tally sheets, rankings, or score sheets used to identify the faculty positions eliminated; (6) email communications among committee members during the committee's pendency; and (7) any audio recordings, transcripts, minutes, notes, or chat logs of meetings. If Defendant contends that any subset of these categories does not exist, it must state so for each category.

**C. Blanket "none" responses to requests concerning institutional decision-making (RFP Nos. 11, 22, 29, 30, 37, 42, 43)**

RFP Response No. 11 (instruction or discussion that retention was based on seniority alone) — "none." RFP Response No. 22 (comparison of Karl Leib to other terminated faculty) — "none." RFP Response No. 29 (consideration of reinstatement, reassignment, or alternative employment for Plaintiff) — "none." RFP Response No. 30 (effort, or decision not to make any effort, to find alternative employment) — "none." RFP Response No. 37 (decision not to pay severance and not to continue the FRC process) — "none." RFP Response No. 42 (Plaintiff's May 11, 2024 retrieval of belongings) — "none." RFP Response No. 43 (instruction to campus safety regarding Plaintiff in May 2024) — "none."

Most of these "none" responses concern Defendant's own institutional decision-making during specific, identifiable events. Several are directly contradicted by Defendant's own RFA Answers: RFA Answer No. 13 describes specific comparative reasoning applied to Karl Leib's retention, yet RFP No. 22 claims no documents exist reflecting any such comparison. RFA Answer No. 27 admits that Plaintiff's FRC appeal was never heard after she revoked the severance agreement, yet RFP No. 37 claims no documents exist concerning the decision to abandon that process. RFA Answer No. 30 admits that campus safety personnel were involved in Plaintiff's retrieval of her belongings, yet RFP Nos. 42 and 43 claim no documents exist concerning that event or any instruction to campus safety. The blanket assertion that no email, memorandum, calendar entry, security log, talking-point document,

or note exists for any of these decisions is difficult to credit without any description of the search conducted. Plaintiff requests that Defendant either (1) supplement each of these responses with all responsive documents, or (2) provide a sworn declaration explaining what was searched and why no documents were located.

## V. Specifically Identified Documents Referenced by Defendant That Have Not Been Produced

### A. The Decisional Unit List (Exhibit B to the Separation and Transition Agreement)

The executed Separation and Transition Agreement at CBU-077 to CBU-083 expressly identifies "Exhibit B – Decisional Unit List" as an enclosure to the Agreement. See CBU-083, at page 7 of the Agreement. I have reviewed Defendant's production. Exhibit B has not been produced.

The Decisional Unit List is a specifically identified document referenced in Defendant's own production. It is directly relevant to determining the group of employees selected and not selected for termination, and to testing Defendant's asserted rationales for its selection decisions. The document is also required disclosure under the Older Workers Benefit Protection Act, 29 U.S.C. § 626(f)(1)(H), in connection with the release of ADEA claims included in the Separation and Transition Agreement. The OWBPA disclosure must include the job titles and ages of all individuals eligible or selected, and the job titles and ages of all individuals in the same job classification or organizational unit who were not selected.

Plaintiff requests that Defendant produce Exhibit B to the Separation and Transition Agreement (the Decisional Unit List) in native format if available, subject to any protective-order treatment the Court may enter. This is a specifically identified document referenced in CBU's own production that has not been produced. To the extent Defendant intends to assert that no Decisional Unit List was prepared, Defendant should so state in writing, and I reserve all rights in connection with that representation.

### B. Paul Haught's contract and any documents reflecting his contractual right to return to a faculty position

As discussed in Section III.A above, Defendant's RFA Answer No. 20 places Dr. Haught's administrative or transition contract directly at issue. Plaintiff's production demands for these documents are set forth in Section III.A and are incorporated here by reference. RFP No. 27 calls for these documents.

### C. Tullia's "folio" of communications regarding Plaintiff

At CBU-061, Dean Tullia wrote to Vice-Provost Rosencrants on December 29, 2023 that, on January 2, 2024, she would "forward a folio with a larger sample of conversations"

concerning me and would copy Department Chair James Wallace, with a "formal request that the supervision of Dr. Leigh Johnson either be moved to my purview or to yours, for the remainder of her contract." The folio is responsive to RFP Nos. 4–5, 12, 18, and 38, and I have not located it in the production.

Plaintiff requests production of the folio identified in CBU-061 and all related communications between Tullia, Rosencrants, and Wallace concerning the supervision or oversight of Plaintiff.

### D. Faculty employment contracts of Department of Religion and Philosophy faculty, including Bruce Cinquegrani

As discussed in Section IV.A, Defendant's responses to RFP Nos. 14, 16, 17, and 18 fail to produce basic employment and comparator documents for Department faculty. This deficiency is particularly acute with respect to Bruce Cinquegrani, whose contractual terms Defendant has placed squarely at issue: RFA Answer No. 8 represents that he "operates under a year-to-year contract," and RFA Answer No. 9 asserts his chaplain and ministerial duties as the basis for differentiating his retention from Plaintiff's termination. Defendant cannot simultaneously rely on those contractual terms and claim that no documents reflect them. Plaintiff requests production of: (1) Mr. Cinquegrani's faculty employment contracts for academic years 2018–2019 through 2024–2025, including annual appointment letters, renewal notices, position descriptions, and amendments; (2) any separate appointment or document setting forth his chaplain or ministerial duties; (3) any documents reflecting whether his retention was treated as a faculty-retention decision under Appendix G or as a non-faculty decision; (4) any communications among the Retrenchment Committee, President, Provost, Dean, or Department Chair concerning his retention; and (5) for the same reasons, faculty employment contracts for the other Department faculty members named in or implicated by Defendant's production — James Buchanan Wallace, Philip Maloney, Scott Geis, Emily Holmes, Burt Fulmer, and Paul Haught — for academic years 2018–2019 through 2024–2025.

## VI. The Karl Leib Retention: Documents Supporting Defendant's Affirmative Comparator Rationale

Defendant's RFA Answer No. 13 offers specific factual rationales for retaining Dr. Leib, including an asserted accreditation requirement, seniority over two male department members, and departmental gender composition. Because Defendant has affirmatively invoked these facts to justify retaining Dr. Leib during the same retrenchment process, I am entitled to documents sufficient to test those asserted rationales.

### A. Scheduled termination meeting and decision not to terminate Dr. Leib.

Plaintiff requests production of documents reflecting Dr. Leib's scheduled December 7, 2023 termination meeting, any cancellation of that meeting, and the decision not to terminate him, including communications among administrators, the Retrenchment Committee, the President, the Provost, the Dean, the Department Chair, or counsel. To the extent Defendant withholds any responsive documents pending entry of a protective order, it should identify them by category and approximate volume consistent with Section I of this letter.

**B. Asserted accreditation requirement.**

Defendant asserts in RFA Answer No. 13 that "CBU had to retain at least one full-time faculty member in the department for accreditation." This is a specific factual claim that either rests on an identifiable accreditation standard or it does not. SACSCOC—CBU's regional accreditor—publishes its standards, and any accreditation requirement that compelled the retention of a specific faculty member in a specific department would be documented in those standards, in SACSCOC correspondence with CBU, or in CBU's own internal accreditation compliance analyses.

Plaintiff requests production of: (1) the specific SACSCOC standard, or standard of any other accrediting body, that Defendant contends required retention of at least one full-time faculty member in the Department of History and Political Science; (2) any internal analysis, memorandum, email, or communication in which CBU identified or discussed this accreditation requirement in connection with the 2023 retrenchment decisions; and (3) any correspondence between CBU and SACSCOC (or any other accrediting body) concerning faculty staffing levels in the Department of History and Political Science. To the extent no such documents exist, Defendant should say so expressly in writing.

**C. The "other 2 male department members."**

Defendant asserts that Dr. Leib had seniority over "the other 2 male department members." Plaintiff requests documents sufficient to identify those two individuals, whether and how their gender was considered in retrenchment decisions, and showing their rank, tenure status, hire dates, years of service, disciplines, and teaching assignments.

**D. Application of Appendix G.3.e criteria.**

Defendant asserts in RFA Answer No. 16 that retention decisions were made by application of the criteria set forth in the Faculty Handbook. Plaintiff requests documents sufficient to show whether and how Appendix G.3.e criteria—including tenure, Christian Brother status, merit, versatility, seniority, and institutional goals regarding women, women religious, and minorities—were applied to Dr. Leib and to other faculty in his department.

**E. Status of the relevant programs.**

Defendant's production identifies Political Science at CBU-217 as a program that "may need to be eliminated or paused," while Defendant's answer to RFA No. 15 denies that the Political Science major was discontinued on the ground that "Political Science was only a minor, not a major," and further states that "Political Science and History classes are still taught at CBU."

Plaintiff requests documents sufficient to show the current status of the History major, Political Science minor, and any related courses or programs affected by the 2023 retrenchment process, including the Philosophy major and minor within the Religion and Philosophy department. Specifically, Plaintiff requests documents showing all courses previously taught by tenured faculty in History, Political Science, Religion, and Philosophy that were subsequently replaced in the academic year following retrenchment (i.e., Academic Year 2024-2025) by adjunct faculty.

### F. Departmental gender composition.

Defendant volunteered in RFA Answer No. 13 that there were "no females" in Dr. Leib's department as part of its explanation for his retention. Plaintiff requests documents sufficient to show whether and how departmental gender composition was considered in connection with any retrenchment or retention decision, including but not limited to the Department of History and Political Science and the Department of Religion and Philosophy.

## VII. Custodians, Litigation Hold, and Preservation

Defendant's objections to RFP Nos. 44, 45, 46, and 47 assert that, because I have not "alleged" that records have been destroyed, the requested information is irrelevant. That is not the standard. Rule 26 permits discovery into preservation steps without a predicate allegation of destruction, particularly where, as here, multiple custodians with material knowledge have left the institution. By Defendant's own production: David Archer is no longer President; Dr. Paul Haught resigned in late 2023; and Dr. Benjamin Jordan has not been employed by Defendant for approximately two years (RFP Response No. 35).

Defendant's assertion that "Counsel has already confirmed that the litigation hold was communicated and upheld" is not a substitute for the disclosures required under RFP Nos. 44–47. A naked assertion that a hold was issued does not identify when, by whom, to whom, with what scope, or whether departing custodians' files were placed under preservation. The gaps in Defendant's production identified in Section VIII of this letter — where specific, identified emails sent to and from multiple @cbu.edu accounts are absent from the production — underscore the need for this information. Plaintiff requests that Defendant supplement these responses with: (1) the date or dates of issuance of any litigation hold concerning my claims or this action; (2) the categories of personnel to whom the hold was directed; (3) the scope of the

hold (subjects, time periods, custodial sources); (4) the steps taken to preserve email, network, shared-drive, and device data of departing or departed personnel, including but not limited to David Archer, Lydia Rosencrants, Paul Haught, Scott Geis, Tawny Tullia, Ron Brandon, Philip Maloney, James Wallace, members of the Faculty Review Committee, and members of the Retrenchment Committee; and (5) whether ordinary deletion, decommissioning, or account-deactivation processes were suspended or modified for those custodians.

I am not, at this stage, alleging spoliation. The point of these requests is to confirm preservation, not to litigate destruction. Defendant's objection conflates the two.

## VIII. Faculty Review Committee Documents in Plaintiff's Possession That Are Absent from Defendant's Production

In reviewing Defendant's production against my own files, I have identified specific documents — on each of which I was a named recipient or was copied — that are responsive to multiple RFP requests and are absent from Defendant's production. These documents were sent to and from CBU email accounts (addresses ending in @cbu.edu) and should exist in the email accounts of multiple current or recently departed CBU employees whose accounts remain under Defendant's custody and control. Their absence from the production raises serious questions about whether Defendant conducted an adequate search of the relevant custodians' email accounts for FRC-related communications.

### A. Geis-to-Plaintiff and Geis-to-FRC correspondence (December 20, 2023 through January 23, 2024)

I possess copies of a chain of emails between FRC Chair Scott Geis (sgeis@cbu.edu) and me (leigh.johnson@cbu.edu), with copies to one or more FRC members at their @cbu.edu addresses, dated December 20, 2023; January 3, 2024; January 10, 2024 (three emails); January 18, 2024; and January 23, 2024 (two emails). These emails concern the scheduling, postponement, rescheduling, and conditions of my FRC appeal hearing. These documents are responsive to RFP No. 33 and RFP No. 34. Defendant's production at CBU-206 through CBU-210 includes some FRC correspondence but does not include the full chain identified above. To the extent any of these documents were withheld as already in my possession, that is not a valid basis for non-production under Rule 34.

### B. Jordan email of January 26, 2024

I possess a copy of an email from FRC member Benjamin R. Jordan (ben.jordan@cbu.edu) to Faculty Assembly President Philip Maloney (pmaloney@cbu.edu), with copies to FRC members Ali Pourhashemi (apourhas@cbu.edu), James Aflaki (jaflaki@cbu.edu), Juliette M. Paul (Juliette.Paul@cbu.edu), and me (leigh.johnson@cbu.edu), and to FRC Chair Scott Geis (sgeis@cbu.edu), dated January 26, 2024, 7:40 PM, Subject: "Re: Faculty Review

Committee Hearing - January 26, 2024." This email concerns the FRC Chair's communications with persons outside the committee regarding my appeal and the FRC's handling of my appeal process. It is directly responsive to RFP Nos. 33, 34, and 35.

This email was sent from and received at multiple @cbu.edu email accounts. Defendant's assertion that "Dr. Ben Jordan has not been employed by CBU for approximately two years" does not excuse the failure to search the accounts of pmaloney@cbu.edu, sgeis@cbu.edu, apourhas@cbu.edu, jaflaki@cbu.edu, and Juliette.Paul@cbu.edu — all of whom received this email on CBU's own mail servers.

### C. Maloney email of January 29, 2024

I possess a copy of an email from Faculty Assembly President Philip Maloney (pmaloney@cbu.edu) to me and Benjamin R. Jordan, with copies to all FRC members and FRC Chair Geis, dated January 29, 2024, 10:56 AM, Subject: "Re: Faculty Review Committee Hearing - January 26, 2024." This email concerns Maloney's direct communications with FRC Chair Geis and Vice President Rosencrants regarding my appeal. It is responsive to RFP Nos. 33, 34, and 36. It was sent from pmaloney@cbu.edu and received at multiple CBU accounts. It has not been produced.

### D. Jordan email of January 31, 2024

I possess a copy of an email from FRC member Benjamin R. Jordan (ben.jordan@cbu.edu) to Philip Maloney and me, with copies to all FRC members and FRC Chair Geis, dated January 31, 2024, 4:37 PM, Subject: "Re: Faculty Review Committee Hearing - January 26, 2024." This email concerns the FRC's internal deliberations, the FRC Chair's procedural decisions regarding the scope of my appeal, and the FRC Chair's communications with persons outside the committee regarding my appeal and related matters. It is responsive to RFP Nos. 33, 34, 35, and 36. It was sent from ben.jordan@cbu.edu and received at pmaloney@cbu.edu, sgeis@cbu.edu, and the @cbu.edu accounts of three other FRC members. It has not been produced.

The absence of these identified documents suggests that Defendant did not search all relevant custodial accounts for communications responsive to RFP Nos. 33, 34, 35, and 36. This deficiency connects directly to Section VII of this letter: my requests for information about custodians and repositories searched remain unanswered, and the gaps identified here demonstrate precisely why those requests are necessary.

Plaintiff requests that Defendant: (1) search the CBU email accounts of Scott Geis, Philip Maloney, Ali Pourhashemi, James Aflaki, Juliette Paul, Lydia Rosencrants, and Benjamin Jordan (to the extent preserved) for all communications responsive to RFP Nos. 33, 34, 35, and 36; (2) produce all responsive, non-privileged documents; and (3) identify in writing the custodians and

repositories actually searched for FRC-related documents and the search terms, date ranges, and methods used.

To the extent not previously identified in Plaintiff's Rule 26(a)(1) Initial Disclosures, Plaintiff hereby identifies the documents described in Sections VIII.A through VIII.D as documents in Plaintiff's possession, custody, or control that Plaintiff may use to support her claims. Plaintiff will supplement her Rule 26(a)(1) disclosures accordingly. Plaintiff's possession of some responsive communications does not relieve Defendant of its independent obligation to conduct a reasonable search and produce responsive documents from Defendant's own custodians, systems, and repositories.

## IX. Specific Deficient or Missing Responses

In addition to the items above, the following responses are independently deficient and should be supplemented:

A. **RFP No. 7 (versions, drafts, comments, attachments, and communications concerning the October 31, 2023 Presidential Charge).** Defendant cites CBU-024–031 and CBU-058–083. Those materials do not appear to include earlier drafts, edits, comments, attachments, or communications concerning the drafting or approval of the October 31, 2023 Presidential Charge. The request reaches those materials. Supplement required.

B. **RFP No. 19 (Emily Holmes resignation).** Defendant objects that Holmes's resignation came "after all retrenchment decisions were made." Defendant's own production contradicts that objection twice. CBU-058 is Holmes's formal resignation letter dated April 10, 2024, which states: "This letter confirms my intent as initially indicated in my email of December 7, 2023, to David Archer and Lydia Rosencrants." CBU-067 contains that referenced email. In it, Holmes wrote to Archer and Rosencrants at 7:40 AM on December 7, 2023 stating that she would not be continuing at CBU past May. Holmes's intent to depart was known to Archer and Rosencrants before the termination meetings that day, not "after all retrenchment decisions were made." Defendant's RFP Response No. 19 directed me only to CBU-058 and did not identify CBU-067 as responsive, even though CBU-067 is in Defendant's own production and is directly responsive to the request. The request reaches all documents concerning Holmes's resignation, including any discussion of its effect on department composition, faculty coverage, or retrenchment decisions. Supplement required.

C. **RFP No. 34 (communications between FRC members and any administrator, dean, chair, HR, board representative, faculty member, or counsel concerning my appeal).** No substantive response. Defendant's response contains only an

objection and no response at all. That is not a proper response under Rule 34(b)(2)(C). As detailed in Section VIII above, I have identified specific responsive communications that were sent to and from CBU email accounts and are absent from the production. A substantive response is required, including identification of any responsive documents withheld and the basis for any privilege claim, and production of all non-privileged responsive materials.

D. **RFP No. 35 (all documents and communications by or involving FRC member Benjamin Jordan concerning my appeal, December 15, 2023 through February 15, 2024).** Defendant states it is "continuing to search" because Jordan is no longer employed by CBU. As detailed in Section VIII above, I have identified at least two emails sent by Jordan from ben.jordan@cbu.edu to multiple CBU email accounts within the specified date range. Defendant's inability to locate Jordan's emails is irrelevant to searching the accounts of the CBU employees who received his emails. Supplement required.

E. **RFP Nos. 39, 40, and 41 (April 26, 2024 Classroom-Removal Incident).** Defendant's response to RFP No. 39 is deficient. RFP No. 39 seeks all documents concerning the April 26, 2024 incident in which Plaintiff was removed from her classroom and brought to a meeting attended by Dean Tullia, Ron Brandon, and law enforcement, including emails, texts, notes, reports, witness statements, security records, and communications with the Memphis Police Department. Defendant's production does not include any incident report, campus safety report, law-enforcement communication, witness statement, security record, written instruction, or internal communication sufficient to explain why law enforcement or campus safety personnel were involved in removing Plaintiff from her classroom.

This absence is especially significant because the incident appears to have been prompted, at least in part, by Plaintiff's April 26, 2024 social-media post stating: "Starting my final week in the classroom tomorrow. It's been a good 20yr run and I think I made a positive impact on at least a few hundred students' lives. Plan on going out with a bang [firecracker emoji]." That post is facially celebratory and retrospective, and was also not produced by Defendant. If Defendant contends that the post justified involvement by law enforcement, campus safety, or senior administrators, Plaintiff is entitled to the documents reflecting that interpretation, including any communications, reports, notes, instructions, screenshots, or records concerning the post and the resulting decision to remove Plaintiff from class.

Defendant's production includes, at CBU-166, "Appendix M: Christian Brothers University Media Policy." That policy appears to concern institutional media relations and communications with external media, not personal social-media posts

by faculty. To the extent Defendant contends that CBU-166, or any other CBU media/social-media policy, justified or informed the April 26, 2024 response to Plaintiff's social-media post, Plaintiff requests that Defendant identify the specific policy provision allegedly implicated and produce all documents reflecting that interpretation, application, or analysis. If Defendant does not contend that Plaintiff's post violated any CBU media, social-media, threat-assessment, campus-safety, or employee-conduct policy, Plaintiff requests that Defendant say so expressly.

F. **RFP No. 36 (documents concerning Philip Maloney's and Provost Rosencrants's involvement in the Faculty Review Committee process relating to Plaintiff).** Defendant's response states only that "documents responsive to this request, if any, are attached hereto." That response does not identify which documents, by Bates number or otherwise, Defendant contends are responsive. Nor does it state whether any responsive documents are being withheld. This is not a proper response under Rule 34(b)(2)(C).

   Defendant has admitted that Rosencrants communicated with FRC Chair Geis during the appeal (RFA No. 25), and Plaintiff has identified specific emails from Maloney concerning those very communications that are absent from Defendant's production (see Section VIII.C). Plaintiff requests that Defendant identify by Bates number all documents it contends are responsive to RFP No. 36, state whether any responsive documents have been withheld and on what basis, and produce all non-privileged responsive documents. Supplement required.

G. **RFP No. 48 (communications with AAUP).** Defendant refers Plaintiff to her own documents, which is inadequate. Defendant should confirm whether it has produced all non-privileged documents and communications concerning the AAUP's July 30, 2024 and September 30, 2024 correspondence, including internal communications about how CBU would respond to AAUP's concerns regarding financial exigency, faculty governance, pre-termination hearing rights, severance, and reinstatement, and any responses authored by President Englert sent to the AAUP. Supplement required.

H. **RFP No. 49.** Defendant's response to RFP No. 49 is deficient and internally inconsistent. RFP No. 49 seeks documents concerning any public statement by CBU or CBU President Br. Chris Englert in or around July 2024 that CBU had ended the 2023–2024 academic year with no debt or operating in the black, including drafts, talking points, interview preparation materials, underlying financial summaries, and communications concerning the accuracy or basis of those statements. Defendant's response appears to deny possession, custody, or control of responsive documents or evidence, while directing Plaintiff to exhibits that themselves confirm the existence of the interview, reporting, recording, and statements at issue.

Plaintiff requests that Defendant supplement its response to RFP No. 49 by producing all non-privileged responsive documents in its possession, custody, or control, including any video recording, audio recording, transcript, internal communications, media-relations communications, drafts, notes, talking points, or correspondence with *The Daily Memphian*, WKNO, Eric Barnes, or any person involved in arranging, preparing for, reviewing, circulating, or responding to the interview. If Defendant contends that it does not possess or control any recording or transcript of the interview, Plaintiff requests that Defendant state that expressly and identify what search was conducted for responsive materials.

I.  **RFP No. 50 (Documents Concerning President Archer's Resignation / Separation from CBU).** Defendant's objections to RFP No. 50 are not sufficient. Former President David Archer is a central decisionmaker in this case. He personally selected Plaintiff's position for elimination, participated in Plaintiff's December 7, 2023 termination meeting, and made statements directly relevant to Defendant's asserted financial-exigency rationale. Vice Provost Rosencrants is also relevant to Plaintiff's internal appeal, the Faculty Review Committee process, and the governance procedures at issue.

Plaintiff is not seeking personal information for its own sake. Plaintiff seeks non-privileged documents sufficient to show what CBU officially communicated to faculty, administrators, trustees, or other relevant constituencies regarding President Archer's resignation, separation, or dismissal, including documents reflecting any reason, explanation, concern, conflict of interest, governance issue, or institutional-process concern communicated or considered in connection with his departure, including any such concern involving persons with roles in the retrenchment, appeal, or Faculty Review Committee processes. Such information is relevant because Archer was the final decisionmaker in Plaintiff's termination, and because Defendant has invoked institutional decision-making processes, including the retrenchment and Faculty Review Committee processes, as part of its defense.

Plaintiff requests that Defendant withdraw or narrow its objections and produce non-privileged documents responsive to RFP No. 50 or, at minimum, documents sufficient to show the reason or reasons communicated in Faculty Assembly meetings during the Spring 2024 semester concerning Archer's resignation, separation, or dismissal. This includes any minutes, agendas, notes, recordings, transcripts, internal communications, talking points, memoranda, or related documents reflecting those Faculty Assembly communications or any related internal communications. If Defendant contends that no responsive documents exist, Plaintiff requests that Defendant say so expressly after a reasonable search and identify the custodians and repositories searched.

## X. Reservation of Rights and Response Deadline

I remain willing to narrow particular requests by agreement where Defendant identifies a specific burden, but generalized objections and unsupported "no documents" responses do not permit meaningful evaluation of whether a reasonable search has been conducted.

Plaintiff also requests that Defendant produce CBU-201 through CBU-205 in native (Excel or comparable) format, with metadata preserved. Plaintiff's Instructions specified that spreadsheets, calendars, databases, and other files whose usability would be diminished by conversion to PDF were to be produced in native format. *See* Plaintiff's First Requests for Production, Instruction No. 6. The position-elimination spreadsheet at CBU-201, the comparator export at CBU-203 to CBU-205, and the severance-presenter list at CBU-202 were produced as flattened images in PDF; native versions would carry creation/modification timestamps, formulas, hidden columns or rows, and authoring metadata that the flattened images do not preserve.

Finally, the Certificate of Service on Defendant's Answers to Plaintiff's First Requests for Admission lists Plaintiff's address as "701 South Barksdale Street, Memphis, TN 38104." That is not Plaintiff's address, and repeats an error Defendant has made in multiple filings. Plaintiff's correct address is 1492 Newton Street NW, Apt. A, Washington, DC 20010, as filed with the Court on July 7, 2025 (ECF 11). Plaintiff does not contest service via email and is not raising a service objection at this time, but requests that Defendant correct its records and confirm in writing that all future filings and discovery papers will reflect Plaintiff's correct address.

Plaintiff reserves all rights, including the right to file a motion to compel under Rule 37(a), seek relief under Rule 26(g) to the extent warranted, seek sanctions for any conduct that warrants them, and seek any other appropriate relief from the Court. Nothing in this letter should be construed as a waiver of any right or argument.

Plaintiff requests Defendant's written response to each item identified in this letter by **5:00 p.m. Eastern / 4:00 p.m. Central on Friday, May 8, 2026.**

Plaintiff will treat the absence of a response by the deadline as Defendant's position that it does not intend to cure these deficiencies, and will proceed accordingly.


Sincerely,


/s/ Dr. Leigh M. Johnson
Dr. Leigh M. Johnson
1492 Newton Street NW, Apt. A
Washington, DC 20010
(901) 679-5937

drleighmjohnson@gmail.com